NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0801n.06

No. 15-1480

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 09, 2015
DEBORAH S. HUNT, Clerk

DONALD GODMAR,                                    )
                                                  )
        Plaintiff-Appellant,                      )
                                                  )
v.                                                )      ON APPEAL FROM THE
                                                  )      UNITED STATES DISTRICT
HEWLETT-PACKARD COMPANY;                          )      COURT FOR THE EASTERN
HEWLETT-PACKARD COMPANY                           )      DISTRICT OF MICHIGAN
DISABILITY PLAN; SEDGWICK CLAIMS                  )
MANAGEMENT SERVICES, INC.,                        )
                                                  )
        Defendants-Appellees.

BEFORE:  DAUGHTREY, COOK, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  Donald Godmar appeals the district

court's grant of judgment on the administrative record to Hewlett-Packard Company

(HP), the Hewlett-Packard Disability Plan (the Plan), and Sedgwick Claims Management

Services, Inc. (Sedgwick), in this action to recover disability benefits under the Employee

Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B).  Godmar

argues the denial of his disability claim was arbitrary and capricious.  We **VACATE** the

district court's judgment and **REMAND** for further proceedings.

**I.**

Godmar worked as a customer-project manager at HP.  In this role, Godmar

managed HP programs at General Motors and led a team of eighteen to forty persons.  He

drove from HP to General Motors on a daily basis and spent eight to ten hours at the

General Motors site.  His position also required more extensive travel approximately

every six weeks. Aside from driving, Godmar's position required five to six hours of sitting per day and less than one hour of standing and walking.

On September 20, 2009, Godmar sustained traumatic injuries to his left leg in a water-skiing accident, including dislocation of his tibia and fibula, a tibia plateau fracture, a torn meniscus, a torn medial collateral ligament, a ruptured plantar fascia, a damaged Achilles tendon, a damaged thigh muscle, damaged ligaments in his ankle, and damaged peroneal, femoral, and sciatic nerves. Over the next three years, Godmar underwent nine surgeries to repair the damage, culminating in a knee-replacement arthroplasty in October 2011. Because of his numerous surgeries, Godmar was prescribed pain medication for more than two years. Godmar took intermittent leaves of absence from HP during treatment for his injuries, including the 2011 knee-replacement surgery. He apparently received disability benefits from HP for at least some of these leaves of absence, including a period in February 2010 and from October 5, 2011 until at least December 31, 2011.[1] Godmar's orthopedic surgeon approved his return to work in early 2012.

HP provides disability benefits through the Plan, which is administered by Sedgwick. In the first twenty-six weeks following the onset of an injury or sickness, an employee is eligible for short-term disability benefits if "totally disabled." An employee qualifies as totally disabled if "unable to perform the material and essential functions" of the employee's "usual occupation," defined as "the customary work assigned" to the employee on the employee's "customary schedule." HP delegated to Sedgwick its

---

[1] Godmar's history of absences after the water-skiing accident is not well documented in the administrative record.

"discretionary authority" to determine whether an employee is totally disabled. This determination is made "on the basis of objective medical evidence," defined as "evidence establishing facts or conditions as perceived without distortion by personal feelings, prejudices, or interpretations."

On June 1, 2012, Godmar visited his primary-care physician, Dr. David Schwarz, to address chronic pain from the water-skiing accident. Godmar also reported to Dr. Schwarz that his medications were "out of control," leading to addiction, depression, and anxiety. Dr. Schwarz's clinical impressions included left great-toe pain, pain-management issues, and left foot and ankle pain. Dr. Schwarz told Godmar not to return to work until July 15, 2012. Godmar took a leave of absence from HP and applied for short-term disability benefits. On June 4, Dr. Schwarz sent Sedgwick a certification that Godmar was disabled. The certification detailed a diagnosis of left leg, foot, and ankle pain arising from the knee-replacement surgery and stated that Godmar was "[u]nable to work" from June 1 to July 15 because of "pain/meds."

In the following weeks, Sedgwick contacted Godmar to discuss his claim and ordered records from his medical providers. Sedgwick's claim examiner requested an internal review by a registered nurse on June 20 to "determine if medical information presented substantiates initial benefits." A nurse then reviewed the disability certification and concluded that "[m]edical information substantiate[d] disability from 6/1 to 6/15." The nurse observed that Dr. Schwarz had referred Godmar to the orthopedic surgeon who performed the knee arthroplasty, Dr. Bruce Lawrence, and asked the examiner to request his notes for further review. The examiner then approved "initial benefits" for June 1

through June 30. Sedgwick contacted Godmar by phone on June 21 to inform him that he was approved for disability through the end of the month.

The nurse reevaluated the available records on July 6 and determined there was no objective evidence to substantiate Godmar's total-disability claim after June. On July 12, while Godmar's claim was still pending, Dr. Schwarz submitted a form to extend Godmar's disability through September 15, 2012. By the end of July, Sedgwick obtained medical records from Dr. Lawrence, the orthopedic surgeon; Dr. Angel Rigueras, a physiatrist; Dr. John Kohn, a pain-management specialist; and Dr. Schwarz, the family physician. A second nurse reviewed the records on July 20 and found there was still no objective medical evidence to support Godmar's claim. The second nurse reevaluated the claim on July 26, after receipt of additional records from Dr. Schwarz, but came to the same conclusion.

Sedgwick issued its decision on July 30, 2012. In a letter to Godmar, Sedgwick informed him that short-term disability benefits had been terminated effective July 1. The letter explained that Sedgwick had reviewed the records from Godmar's physicians, including Drs. Lawrence, Kohn, Rigueras, and Schwarz, and concluded that "[t]he medical documentation . . . [did] not contain objective findings to support [Godmar's] inability to perform [his] usual and customary job duties." The letter acknowledged that "a medical condition may exist" but stated that "there must be objective medical information to support disability benefits" under the Plan. Lastly, Sedgwick informed Godmar that he would need to "submit a written appeal and objective medical evidence" to perfect his claim.

Godmar submitted an appeal on August 8, 2012. In a six-page letter, Godmar addressed the findings Sedgwick cited in its decision and elaborated on the circumstances of his treatment in June and July. He explained that he was on morphine twenty-four hours per day, could no longer drive, and slept more than twenty hours per day several times per week. He also described his plan to seek professional help to address his opiate addiction. He attached a detailed spreadsheet that he and his wife used to track his medications. On August 15, the day after Sedgwick received the appeal, Godmar checked himself into the Brighton Center for Recovery to treat his addiction; he was successfully discharged on August 28. On August 27, Dr. Schwarz sent Sedgwick a letter reiterating his support for Godmar's disability claim and explaining that Godmar could not perform the core functions of his HP position because of his chronic pain and medication.

Sedgwick sent Godmar's records to two board-certified physicians to conduct outside reviews. Dr. Richard Kaplan reviewed Godmar's records from a physical-medicine perspective and found that although Godmar "appear[ed] to have [a] residual clinical finding in his left lower extremity from both an orthopedic and a neurological perspective," this limitation "would not impact [Godmar's] usual work activities" according to his job description. Dr. Kaplan concluded that Godmar was not totally disabled. Dr. Marcus Goldman reviewed Godmar's file from a psychiatry perspective and found that Godmar was disabled from August 15 to August 28—the period when Godmar "was actively treating in a rehabilitation facility for his history of opiod [sic] addiction and was incapable of function or working due to his confinement." Outside this period, Dr. Goldman concluded, there were "no relevant data to support disability."

Relying on these reports, Sedgwick issued a decision on September 28 approving benefits from August 15 to August 28 and otherwise denying benefits beginning on July 2.

Godmar's attorney contacted Sedgwick on November 1, 2012, to inquire whether additional documents could be submitted. Sedgwick offered to "review new or additional information pertaining to Mr. Godmar's claim, providing information submitted is not duplicate documentation already contained in the file." Before the end of the month, Dr. Jeffrey M. Rosenberg, a pain specialist who treated Godmar, submitted a certification of disability to Sedgwick, and Dr. Schwarz submitted another certification on December 3. On March 14, 2013, Godmar's attorney sent a forty-six-page letter and additional documentation, including records dating back to 2009 from more than a dozen doctors who treated Godmar after his water-skiing accident.

Drs. Kaplan and Goldman reviewed the new files and spoke with Godmar's providers. Dr. Kaplan remarked that "this new information continues to not address the question of whether the claimant could perform his usual activity, which is essentially a sedentary desk type job," and Dr. Kaplan reaffirmed his opinion that any limitations were "based on subjective symptoms" and "not clearly supported objectively by [Godmar's] neurological or orthopedic condition." Dr. Goldman reviewed evidence of "depression, anxiety, pain and opiate use" but reported that these issues "are not pathological" and "[m]ost mental status examinations . . . revealed no significant abnormalities." Sedgwick engaged Dr. James Tran, a neurosurgeon, to conduct a third file review. Dr. Tran concluded there was "no evidence of neurologic deficits" that would impact Godmar's "ability to function," citing the same evidence that the nurses described in their initial reviews.

Sedgwick issued its final decision on June 4, 2013, concluding there was insufficient objective evidence to support Godmar's claim of total disability after June 2012, except for the period he was at Brighton Recovery Center in August 2012. Godmar did not return to work until February 2014. Godmar brought this ERISA action to recover disability benefits, and the district court granted judgment on the administrative record to HP, the Plan, and Sedgwick.

**II.**

We review the district court's judgment de novo and apply the same standard of review as the district court. *Waskiewicz v. UniCare Life & Health Ins. Co.*, 802 F.3d 851, 855 (6th Cir. 2015). Where, as here, the benefits plan grants the administrator discretion to make eligibility determinations, we review the administrator's decision under a deferential arbitrary-and-capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1065 (6th Cir. 2014). "[W]e will uphold a plan administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991) (per curiam)).

**III.**

**A.**

Godmar first challenges Sedgwick's decision to deny his claim after approving one month of benefits. Sedgwick's decision was arbitrary and capricious, he argues,

because it reversed the initial disability determination without evidence that his condition had improved. We disagree.

Godmar relies on two cases addressing the cancellation of approved benefits. In *Kramer v. Paul Revere Life Insurance Co.*, 571 F.3d 499 (6th Cir. 2009), we held that a plan administrator's decision to terminate benefits was arbitrary and capricious because the administrator offered "no explanation for the decision to cancel benefits that had been paid for some five years based upon the initial determination of total disability in the absence of any medical evidence that the plaintiff's condition had improved during that time." *Id.* at 507. And in *Morris v. American Electric Power Long-Term Disability Plan*, 399 F. App'x 978 (6th Cir. 2010), we observed that it "would be the very definition of 'arbitrary and capricious'" for a plan administrator that makes an initial disability determination to "reverse[] course" without "a *reason* for the change." *Id.* at 984 (emphasis in original).

Unlike the plan administrators in those cases, however, Sedgwick did not cancel approved benefits. In both *Kramer* and *Morris*, the claimant received ongoing long-term disability benefits—for five and twelve years, respectively—that were terminated after the plan administrator reexamined the longstanding disability determination. *See Morris*, 399 F. App'x at 986; *Kramer*, 571 F.3d at 507. In contrast, Godmar applied for short-term disability benefits and received preliminary approval for only the first month of his claim. Sedgwick did not terminate the approved month of benefits or reverse its limited eligibility determination; rather, Sedgwick declined to approve continued benefits.

Further, the justification for Sedgwick's initial approval contemplates a subsequent denial. The approval was the result of the consulting nurse's terse

recommendation, after reviewing Dr. Schwarz's one-page disability certification, that Sedgwick should approve two weeks of disability benefits. She noted Godmar's referral to an orthopedic surgeon and stated that the notes from that meeting would be necessary to extend his disability benefits. The examiner then approved a full month of benefits—twice the length recommended by the nurse—and noted, "Initial beneits [sic] approved from 01-JUN-2012 thru 30-JUN-2012 to prevent lapse in benefits while obtaining additional information for review. Benefits beyond 30-JUN-2012 is pending receipt and review of medical information requested."

Thus, Godmar's argument that Sedgwick could not deny further benefits without evidence of improvement is misplaced. In *Morris*, we explained that when an administrator evaluates whether further benefits are appropriate, "the ultimate question is whether the plan administrator had a rational basis for concluding that [the claimant] was not disabled at the time of the new decision." *Morris*, 399 F. App'x at 984. Sedgwick's denial of benefits would be arbitrary and capricious only if it lacked a rational basis at the time of the denial, regardless of its earlier approval.

**B.**

Godmar also challenges Sedgwick's decision-making process, particularly its reliance on a file review conducted by consulting physicians. Sedgwick's decision was arbitrary and capricious, he argues, because Sedgwick selectively reviewed the record and improperly dismissed his limitations as subjective. We agree.

**1.**

After three rounds of review, Sedgwick determined there was no objective evidence that Godmar had a total disability. Godmar argues that Sedgwick cherry-picked

evidence from the record to reach this conclusion. We have explained that plan administrators may not engage in a "selective review of the administrative record," *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005), by ignoring evidence of disability or giving undue weight to evidence favoring denial, *see, e.g.*, *Shaw v. AT&T Umbrella Benefits Plan No.1*, 795 F.3d 538, 548–50 (6th Cir. 2015); *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007); *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Bos.*, 419 F.3d 501, 509 (6th Cir. 2005). When an administrator "focuse[s] on slivers of information that *could be* read to support a denial of coverage and ignore[s]—without explanation—a wealth of evidence that directly contradict[s] its basis for denying coverage," the administrator's "decision-making process is not deliberate or principled." *Conger*, 474 F.3d at 265 (emphasis in original).

Sedgwick's decision-making process is difficult to parse. Its final denial letter offered little analysis of Godmar's medical records. Most of the letter is a rote recitation of the records Sedgwick received and the steps taken by its consulting physicians. The letter then provides a brief summary of the medical documentation—including "chronic nerve pain," "ongoing pain management," and "opioid dependence with substantial limitations"—and offers a conclusory assertion that this evidence is insufficient to support disability benefits. But there appears to be no dispute that Godmar suffered from continuing injuries and pain from the water-skiing accident at the time he requested disability. For example, Dr. Kaplan, one of Sedgwick's reviewers, observed that Godmar's medical data evidenced an "extremely complex combined orthopedic and neurological injury." Sedgwick's decision rested on the conclusion that the pain Godmar suffered from these injuries would not prevent him from performing his job at HP.

This determination was contrary to the opinions of Godmar's treating physicians, who supported his claim. "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians," and there is no "discrete burden of explanation when [administrators] credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003); *see also Balmert*, 601 F.3d at 504. But administrators also "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006). The Supreme Court has described "the opinions of a treating physician" as "reliable evidence" of disability. *Nord*, 538 U.S. at 834.

Three of Godmar's treating physicians informed Sedgwick that Godmar could not perform his job at HP. Dr. Schwarz, his family physician, repeatedly documented pain in Godmar's left leg and certified to Sedgwick that Godmar was totally disabled in June, July, and December 2012. Dr. Rigueras, a physiatrist, concluded that Godmar had lumbar radiculopathy, neuropathy, and knee pain, and noted in late June 2012 that Godmar could not "run, jump, [or] sit for long times." In May 2013, Dr. Rigueras told Dr. Tran, one of the consulting physicians, that Godmar would be disabled until 2014. Dr. Rosenberg, a pain-management specialist, reported in September 2012 that Godmar had "burning, electric shock-like, sharp, stabbing, dull, and shooting" pain that was increased by "sitting, standing, physical activity, work activity, and lying down." He diagnosed Godmar with complex regional pain syndrome and described Godmar's symptoms as "persistent, severe, [and] disabling." In November 2012, Dr. Rosenberg sent Sedgwick a certification that Godmar was disabled by "consistent pain in left knee

and foot with muscle spasms, numbness, tingling and weakness," as well as "increased pain with physical activity (sitting, standing)."

These findings were corroborated by other treating physicians. Dr. Susan Mosier-LaClair, an orthopedist, noted in October 2012 that Godmar had "diffuse paresthesias in the distribution of the peroneal nerve both common and deep and superficial today from the fibular head area or knee joint down through the foot" that "can feel like a stabbing sensation or ice pick." She stated that these symptoms were mainly "related to the dyesthesias of the peroneal nerve" and recommended him for a spinal stimulator. Dr. Holly Gilmer, a neurosurgeon, reported in December 2012 that Godmar had "pain specifically at the fibular head on the left, and around his ankle as if there is a tourniquet" and recorded an impression of peroneal neuropathy. Dr. Mary Spires, a physical-medicine specialist, noted in January 2013 that Godmar had "severe pain," including his left foot feeling "on fire" and "a stabbing pain like he is being penetrated with an ice pick" in his left knee. Dr. Spires had difficulty evaluating his strength because "the pain inhibits testing." Dr. Spires's impression was "neuropathic pain trauma" and she told Godmar that there might be no "method[] of resolving his pain" and that he would likely "have pain for the long-term and for lifetime."

Sedgwick apparently determined that these reports were not credible, relying on the reports of its three consulting physicians—Drs. Tran, Kaplan, and Goldman—who determined Godmar was not disabled. Dr. Tran, the neurosurgeon, offered little reasoning to support this conclusion. His initial report, submitted April 12, 2013, included almost no analysis. Seven of the report's ten pages are a recitation of Godmar's medical history and the records submitted in support of Godmar's claim. *Cf. Elliott v.*

*Metro. Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006) (describing a report that consisted mostly of findings described in earlier documentation); *Kalish*, 419 F.3d at 509 (describing a report that was almost entirely medical history). The remaining pages repeatedly describe Dr. Tran's conclusion that Godmar was not disabled because of one record—a report of an electromyographic (EMG) study conducted by Dr. M. Nasser Sabbagh on June 26, 2012. Dr. Sabbagh's report, on referral from Dr. Schwarz, revealed "left sciatic or common peroneal mononeuropathy," which showed "significant improvement" from an EMG study conducted in 2010. Dr. Tran concluded that Godmar was not disabled because there was improvement in the EMG and "no evidence of neurologic deficits."

Dr. Tran also spoke to Dr. Gilmer, who told him that Godmar had a "sciatic nerve injury" and had "trouble standing" because of "severe leg pain." Dr. Tran reported this conversation but did not discuss it in his assessment. Dr. Tran did not explain why Dr. Gilmer's report that Godmar had trouble standing—or the similar reports in the medical records—did not substantiate that Godmar was impeded from performing his job at HP; in fact, Dr. Tran made no reference to Godmar's job description in his analysis. *Cf. Elliott*, 473 F.3d at 619 (describing a report that "offered no specific rebuttal to [a treating physician's] conclusions" and did not opine how the claimant's "medical condition related to the demands of her job"). After receiving this report, Sedgwick insisted that Dr. Tran speak to more of Godmar's treating physicians in May 2013. He eventually spoke to Dr. Rosenberg, who told Dr. Tran that Godmar had "complex regional pain syndrome" but said he "would not be able to comment on the claimant's disability." Dr. Tran also spoke to Dr. Rigueras, who told him that Godmar "was disabled from lumbar

radiculopathy, neuropathy, and knee pain." Dr. Tran affirmed his earlier opinion, stating, "My conversation with the attending providers did not reveal any evidence of loss of function from the claimant's left leg pain that would preclude the claimant's ability to perform his regular unrestricted occupation."

Dr. Kaplan, the physical-medicine specialist, offered substantially more analysis than Dr. Tran. In his September 2012 report, Dr. Kaplan concluded that Godmar "appears to have residual clinical finding in his left lower extremity from both an orthopedic and a neurological perspective," but "these limitations would not impact the claimant's usual work activities per the job description," which he described as "essentially a desk based cognitive job." He did not speak to Godmar's attending providers, and he made little reference to the records provided by Drs. Schwarz and Rigueras, which he described as "only partially legible." Dr. Kaplan apparently did not account for the fact that Godmar was required to drive between GM and HP on a daily basis. In his April 2013 report, Dr. Kaplan again noted that Godmar had a "substantial impairment" that would prevent him from "performing numerous types of heavy activity," but concluded that "[t]he overwhelming preponderance of [the] evidence suggests that return to this claimant's usual employment would be not only possible, but likely therapeutic."

In reaching this conclusion, Dr. Kaplan placed great weight on a conversation with Dr. Rosenberg, one of Godmar's pain-management physicians. Dr. Rosenberg told Dr. Kaplan that Godmar had "essentially subjective symptoms in terms of sedentary activities" and that Godmar "often appears comfortable in the office." They discussed performing a functional capacity evaluation but decided that it "might be challenging to

determine the question of sitting tolerance." Dr. Kaplan made no mention of Dr. Rosenberg's certification to Sedgwick that Godmar was unable to perform his job at HP in November 2012 because his pain made it difficult to sit or stand. Further, this conversation took place in April 2013, more than ten months after Godmar applied for disability. Dr. Rosenberg's observation in April 2013 that Godmar could sit comfortably did not address directly whether he was disabled in July or August 2012.

Dr. Kaplan also relied on the report of Dr. Michael Sytniak, a psychologist who saw Godmar in January 2013. Dr. Sytniak recommended behavioral treatment "to assist [Godmar] in adjusting to his ongoing pain" and to "help[] him adjust to his pain and develop a more adaptive approach to managing it." Dr. Kaplan described this report as suggesting "that limitations in the claimant's ability to perform cognitive desk type work appear to be based on subjective symptoms," and interpreted Dr. Sytniak to suggest "that increasing or returning to the claimant's former level of activity may well be therapeutic from an overall cognitive behavioral perspective." But Dr. Sytniak's conclusion that Godmar could learn to adjust to his pain does not address whether Godmar was disabled from performing his job in 2012, and Dr. Sytniak did not recommend that Godmar return to his former level of activity.

Lastly, the consulting physicians did not respond to Godmar's claim that he was disabled by the side effects of the medication prescribed to treat his chronic pain. Dr. Schwarz noted in his June 2012 disability certification that Godmar's medication prevented him from performing his job at HP, and in his August 2012 appeal, Godmar stated:

> Currently, I am not able to function in my normal personal activities or
> work activities due to the 24 hours a day morphine consumption and use

of Percocet.  On my current meds I am restricted from driving, and I am sleeping up to 20 hours per day several times a week.

Dr. Schwarz observed in his August 2012 letter:

The combination of severe trauma, multiple surgeries and use of prescribed medications have not only left Mr. Godmar with opiate addiction; it has also impacted his ability to perform daily personal tasks and the requirements of the job.

Mr. Godmar has not driven an automobile since May 29, 2012.  His state of mind at that time and through August 15, 2012 impaired his abilities to analyze data, provide recommendations, program management duties, team management, customer management and travel – all of which were examples of job functions related to his position at Hewlett Packard.  I certainly cannot believe that Hewlett Packard would be accustomed or supportive of Mr. Godmar representing his role in this state.

Dr. Schwarz attached Godmar's pharmacy records, which included prescriptions for morphine on June 1, June 18, July 17, and August 13, 2012.

Dr. Goldman, Sedgwick's psychiatric reviewer, concluded that there was no objective evidence that Godmar's addiction issues prevented him from working until he was confined in the recovery center.  But Dr. Goldman did not address the effects of Godmar's pain medications—nor did Drs. Tran or Kaplan.  Sedgwick's final denial similarly failed to even mention the issue.  Neither Sedgwick nor its consultants explained how Godmar could perform a job that required him to drive between HP and GM on a daily basis while he was prescribed a regimen of morphine that prevented him from driving.  Sedgwick's failure to address this issue counsels in favor of finding that its decision was arbitrary and capricious.  *See, e.g.*, *Conger*, 474 F.3d at 265.

**2.**

Sedgwick appears to have rejected the treating physicians' clinical impressions mainly because they relied on Godmar's descriptions of his pain.  Sedgwick made this

judgment without conducting an independent medical examination, relying only on a file review. We have explained that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005)) (internal quotation marks omitted). However, Sedgwick had the right to examine Godmar under the Plan, and the decision not to exercise that right "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (quoting *Calvert*, 409 F.3d at 296) (internal quotation marks omitted).

File reviews are particularly troubling when the administrator's consulting physicians—who have never met the claimant—discount the claimant's limitations as subjective or exaggerated. *See Calvert*, 409 F.3d at 296–97. Thus, we have observed that "reliance on a file review may be inadequate" when "the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 878 (6th Cir. 2006) (quoting *Calvert*, 409 F.3d at 297 n.6) (internal quotation marks omitted). Further, "we will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility." *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008).

Here, Sedgwick and its consulting physicians concluded that Godmar's consistent reports of pain were not objective evidence of disability. Sedgwick acknowledged Godmar's extensive injuries and his treating physicians' continuous documentation of

pain in his left leg. But the consulting physicians apparently dismissed Godmar's reported pain—and any corroborating diagnosis by his treating physicians—as inherently subjective. In so doing, Sedgwick implicitly determined that Godmar's description of his limitations was not credible. *Cf. Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 395–96 (6th Cir. 2009) (stating that dismissing a claim as subjective is an implicit credibility determination).

We addressed similar situations in *Smith v. Continental Casualty Co.*, 450 F.3d 253 (6th Cir. 2006), and *Shaw v. AT&T Umbrella Benefits Plan No. 1*, 795 F.3d 538 (6th Cir. 2015). In *Smith*, we explained that making "credibility findings concerning [the claimant's] pain without the benefit of a physical exam" would "support the finding that [the administrator's] determination was arbitrary." 450 F.3d at 264. And in *Shaw*, we observed that the administrator "should not have made a credibility determination about [the claimant's] continuous reports of pain" without an examination, even under an objective-evidence standard. 795 F.3d at 550. "Because chronic pain is not easily subject to objective verification, the Plan's decision to conduct only a file review supports a finding that the decision-making was arbitrary and capricious." *Id.* Like the administrators in *Smith* and *Shaw*, Sedgwick decided that Godmar's pain was subjective without examining him, and that failure weighs in favor of a determination that the denial of his claim was arbitrary and capricious.

**3.**

On this record, we conclude that the decision to deny Godmar's claim for short-term disability benefits beginning in July was arbitrary and capricious. First, Sedgwick's determination that Godmar could perform his job at HP from July 2, 2012, until he

entered recovery on August 15, 2012, is an unsupported interpretation of the record. Godmar's severe pain and prescription medications prevented him from driving, a requirement of his job, and Sedgwick improperly determined that Godmar's pain symptoms were not objective evidence of disability without a medical examination. Further, Sedgwick also failed to adequately explain why it rejected evidence of Godmar's disability from August 29, 2012, when the records of his treating physicians were completely aligned in assessing his injuries, his pain, and his limitations, through November 5, 2012, the earliest date that Godmar's records suggested he might not be objectively disabled. Dr. Rosenberg's April 2013 conversation with Dr. Kaplan may have called Godmar's disability into question beginning on some date to be determined through a "deliberate, principled reasoning process," *Balmert*, 601 F.3d at 501, but the record does not reflect such a process or determination.

Thus, "we have two options: award benefits to the claimant or remand to the plan administrator." *Shaw*, 795 F.3d at 551. "[R]emand to the plan administrator is appropriate 'where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled.'" *Cooper*, 486 F.3d at 171 (quoting *Elliott*, 473 F.3d at 622). In this case, the record establishes that Godmar was entitled to benefits until he was discharged from the recovery center on August 28, 2012, because there was objective evidence of his disability and no basis to conclude otherwise. But because we cannot say that Godmar is "clearly entitled to benefits" after August 28, the appropriate remedy is a remand to the district court for the "full and fair" review required by ERISA. *Elliott*, 473 F.3d at 622–23. On remand, Sedgwick should remain cognizant of Godmar's full job description,

avoid making credibility determinations without the benefit of a physical examination, and if it concludes that Godmar is not entitled to further benefits, explain why the evidence proffered by Godmar's treating physicians does not meet its objective-evidence standard as of a particular date.

## IV.

For these reasons, we **VACATE** the district court's judgment and **REMAND** to the district court with instructions to enter an order awarding Godmar short-term disability benefits from July 2, 2012, to August 15, 2012, and otherwise remanding the case to Sedgwick for a full and fair review.