NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0032n.06

Case No. 18-1542

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 22, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARC C. JACKSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| BLUE CROSS BLUE SHIELD OF MICHIGAN | ) | MICHIGAN |
| LONG TERM DISABILITY PROGRAM, | ) | |
| | ) | **OPINION** |
| Defendant-Appellee. | ) | |

BEFORE: BOGGS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Marc Jackson sued the Blue Cross Blue Shield of Michigan Long Term Disability Program (the "BCBSM Program") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to collect long-term disability benefits. Jackson alleges that his back pain and fibromyalgia prevent him from working as a customer service supervisor at Blue Cross Blue Shield of Michigan ("BCBSM"), his employer of more than two decades. Although Jackson complains of debilitating pain—and MRI scans of his cervical and lumbar spine reveal disc degeneration—multiple doctors who examined Jackson or reviewed his medical history found him fit to work. And a functional-capacity evaluation, a type of endurance test, revealed as much. Thus, Broadspire Services, Inc. ("Broadspire"), the BCBSM Program's plan administrator, denied Jackson's claim for long-term disability benefits, prompting this lawsuit. The district court granted judgment to the BCBSM Program, finding that the denial of benefits was not arbitrary or capricious. We AFFIRM.

**I.**

Now 54 years old, Marc Jackson joined BCBSM as a mail clerk and, after several promotions, became a customer service representative in 2004. In that role, which BCBSM defines as "sedentary," Jackson fielded phone calls—sometimes from, by his account, "irate" callers—assigned cases, and served as a department liaison.

Jackson suffered an injury to his neck and back in May 2006, and MRI scans taken shortly thereafter revealed several herniated discs in his spine. Jackson underwent surgery and received lumbar injections to treat the herniations, but his pain worsened over time, and on December 23, 2014, he stopped working.

In July 2015, Jackson applied for long-term disability benefits through the Blue Cross Blue Shield Long Term Disability Association Program (the "Association Program"). A separate entity from BCBSM, the Associated Program administered long-term disability plans on behalf of several Blue Cross Blue Shield Association licensees, and its National Employee Benefits Committee ("NEBC") was the first plan administrator to review Jackson's claim. In 2017, while NEBC was reviewing Jackson's claim, the BCBSM Program spun off from the Associated Program and hired Broadspire to act as its plan administrator. In essence, Broadspire replaced NEBC as the plan administrator, but in all other respects, the terms and conditions of Jackson's long-term disability plan (the "Plan") remained unchanged.

The Plan sets forth eligibility criteria for obtaining disability benefits. First, the claimant must provide "objective medical evidence satisfactory to [the Plan's administrators]" that he is "wholly prevented" from engaging in any occupation comparable to his occupation at the time of employment. (R. 33–1, Plan Terms and Conditions at PageID #2116.) And the claimant has the burden to show these three elements: (1) that he has a disabling mental or physical condition;

(2) that, after his employer makes reasonable accommodations, he is still unable to perform his job; and (3) that the mental or physical disability is the cause of his inability to work. (*Id.* at PageID #2118–19.)

The Plan gives the administrator the sole discretion to make final and binding eligibility determinations. But the Plan provides for several levels of review before an eligibility determination becomes final. The claim first goes before the Medical Review Committee ("MRC"). If the MRC denies a claim, the claimant may appeal to the Claims Appeal Committee ("CAC"). And if the CAC denies a claim, still another level of review remains: an administrator must approve the CAC's decision. Here, committees and administrators affiliated with NEBC and Broadspire reviewed Jackson's claim five separate times.[1] We summarize the review process below.

## A.

The MRC received Jackson's claim in September 2015, and its review was extensive: the MRC analyzed years of Jackson's medical records, which included statements from his neurologist, Kevin Lee, M.D., and his primary-care physician, Marshall B. Sack, D.O., attesting to his disability. Jackson also participated in a functional-capacity evaluation ("FCE"), a type of endurance test that measures one's ability to work. And finally, the MRC retained Terry L. Nicola, M.D., a physical medicine and rehabilitation physician, to review Jackson's claim.

Nicola determined that Jackson's records did not support a finding of disability. According to Nicola, the FCE showed that Jackson could complete more than 88% of the tasks associated with sedentary work, even though he had applied inconsistent performance and unacceptable effort

---

[1] Presiding below, Judge Avern Cohn—who became a federal judge in 1979—remarked that the administrative record in this case "is the largest [he] has encountered in an ERISA denial of benefits case . . . ." (R. 16, Order at 4–5.)

during 33% of the test. In essence, the test indicated that Jackson was capable of greater functional abilities than he demonstrated during the evaluation and also suggested that he could perform jobs at the sedentary level. Thus, the MRC denied Jackson's claim.

**B.**

Jackson appealed the MRC's denial to the CAC. That committee considered the evidence before the MRC, as well as new medical evidence, including notes from Jackson's endocrinologist, who treated Jackson's diabetes, and Jackson's therapist. The CAC also referred Jackson to Neil Friedman, M.D., a physical medicine and rehabilitation physician, who conducted an independent medical examination of Jackson. Although Friedman was fully aware of Jackson's medical history, including his diabetes and mild peripheral neuropathy, he was "unable to identify any significant medical impairments and did not identify any barriers in [Jackson's] ability" to work at the sedentary level. (R. 24–2, Association Program Letter at PageID #542.)

Although the CAC affirmed the MRC's findings about Jackson's physical condition, it concluded that it lacked sufficient evidence to determine whether Jackson suffered from a disabling *psychiatric* condition—even though Jackson did not claim a disability on that ground. The CAC, in effect, remanded Jackson's claim to the MRC to conduct a psychiatric evaluation. And in the interim, the CAC granted Jackson long-term disability benefits while the MRC reevaluated his claim.

**C.**

Psychiatrist Jeffrey Kezlarian, M.D., evaluated Jackson on behalf of the MRC. Kezlarian noted that while Jackson suffers from chronic mild depression, he does not have any emotional or cognitive impairments that would prevent him from working a sedentary job. With this new piece

of information, the MRC concluded that Jackson did not have a psychiatric disability, either, and denied his claim for benefits.

**D.**

Once more, Jackson appealed to the CAC, which this time affirmed the MRC's decision. The CAC evaluated the body of evidence that had accumulated over the review process and considered still more evidence, including letters from Jackson's personal physicians, Dr. Sack and Dr. Lee. Sack, Jackson's primary-care physician, relayed Jackson's subjective accounts of pain, fatigue, and depression, and concluded that Jackson was unfit to work. And Lee, Jackson's neurologist of ten years, described several factors contributing to Jackson's pain, including diabetes—which had caused peripheral neuropathy and nerve damage—and injuries to Jackson's cervical and lumbar spine. According to Lee, the pain prompts Jackson to change positions frequently, and the medication Jackson takes to relieve that pain causes cognitive problems. Lee, too, concluded that Jackson cannot work on a permanent basis.

Jackson also advanced additional objective medical evidence documenting his condition, including an electromyogram and nerve-conduction study, which showed mild bilateral calf atrophy and absent reflexes. And Jackson submitted new MRI scans of his lumbar and cervical spine taken in 2016, which revealed that Jackson's disc degeneration had progressed since his 2006 and 2009 scans but that Jackson's condition was still mild to moderate.

Because Jackson submitted new evidence documenting his condition, the CAC retained another physician to review Jackson's claim. A neurosurgeon, Luc D. Jasmin, M.D., Ph.D., reviewed Jackson's file and determined that there is "no reliable, valid, and reasonably compelling evidence" that Jackson is disabled. (R. 24–4, Association Program Letter at PageID #606.) To the contrary, Jasmin singled out Jackson's September 2015 FCE as evidence that Jackson has "the

capabilities and tolerance to function at the sedentary physical demand level, even given [Jackson's] inconsistent performance and unacceptable effort." (*Id.* at PageID #606–07.) The CAC sent Jackson an October 2016 letter informing him of its decision to deny his claim.

### E.

The CAC's denial of Jackson's claim was not the last chapter in the review process. Jackson appealed the denial and submitted still more medical evidence, including the results from a second FCE that he took in February 2017. Paul Zmuda, the occupational therapist who conducted the FCE, summarized its findings, writing that "[i]t would be difficult [for Jackson] to perform regular job duties," and recommend that Jackson receive "Pain Management, Occupational Reeducation, along with Physical Therapy or Chiropractic visits." (R. 24–3, Palmer Letter at PageID #564.)

Broadspire, the new plan administrator, conducted a final review and retained three more physicians to evaluate Jackson's claim: Phillip Williams, M.D., a neurosurgeon; Chirag Raval, M.D., a psychiatrist; and Stanley Yuan, M.D., an anesthesiologist. All three physicians concluded that Jackson did not have any physical or psychiatric limitations that would prevent him from working in a sedentary position. Thus, in a July 2017 letter, Broadspire notified Jackson that it was upholding the CAC's denial of his claim.

### F.

Having exhausted his administrative remedies, Jackson sued the BCBSM Program in federal court, alleging a violation of 29 U.S.C. § 1132(a)(1)(B). Both parties filed cross motions for judgment; the district court granted the BCBSM Program's motion and denied Jackson's motion. This appeal followed.

**II.**

We review the district court's judgment de novo. *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015). But we apply a different standard when reviewing an ERISA plan administrator's underlying decision to deny a claim. When, as here, the administrator has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," we review its decision under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under that "highly deferential" standard, *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991), we must uphold the administrator's decision if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). If the decision is "rational in light of the plan's provisions," it is not arbitrary and capricious. *Miller*, 925 F.2d at 984 (internal quotation marks and citation omitted).

**III.**

We first consider whether the Plan's administrators were operating under a conflict of interest that influenced their denial of Jackson's claim. In the ERISA context, a conflict may exist when a plan administrator is simultaneously responsible for evaluating a claim *and paying out* the benefits. In such cases, the administrator's fiduciary interest in granting a valid claim may conflict with its financial interest in denying that claim. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). The conflict may arise "even when . . . the administrator is an insurance company and not the beneficiary's employer." *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009) (*citing Glenn*, 554 U.S. 105, 112-15 (2008). Such conflicts do not render the denial of benefits invalid per se, but the reviewing court must take the conflict into account when evaluating the administrator's decision. *Curry v. Eaton Corp.*, 400 F. App'x 51, 58 (6th Cir. 2010).

Jackson asks this court to infer the existence of a conflict where none exists. He argues that the Association Program, which oversaw the first four reviews of his claim, has an "inherent conflict" with Jackson's employer, BCBSM. (Appellant Br. at 28.) Setting aside the fact that the Associated Program and BCBSM are two separate, independent entities, the Associated Program had no financial incentive to deny Jackson's claim. If the Associated Program had granted Jackson's claim, an independent trust—the National Long Term Disability Trust—would have funded Jackson's benefits. And it was BCBSM—*not the Associated Program*—that contributed to that trust. As a result, we agree with the district court's conclusion that the Associated Program was not operating under a conflict of interest.[2]

## IV.

We next consider whether Broadspire's final decision to deny Jackson's claim was arbitrary and capricious. At the outset, we again underscore that our review is "'extremely deferential and . . . the least demanding form of judicial review.'" *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107–08 (7th Cir. 1998)). Thus, we must uphold an administrator's decision if it results from a deliberate, principled, and reasoned process and is supported by substantial evidence. *Id.* at 1064–65.

Jackson first argues that while NEBC and Broadspire may have compiled a larger *quantity* of medical evidence that weighed against his claim, he supplied higher *quality* evidence

---

[2] We note that the Fifth Circuit reached the same conclusion when evaluating a similar relationship between Blue Cross Blue Shield of Louisiana and the Associated Program. *See Dix v. Blue Cross and Blue Shield Ass'n Long Term Disability Program*, 613 F. App'x 293, 296 (5th Cir. 2015) (per curiam).

demonstrating his inability to work. Relatedly, Jackson contends that the objective medical evidence he set forth supports his subjective complaints of pain.

To be sure, Jackson's MRI scans reveal disc degeneration and his electromyogram points to calf atrophy and absent reflexes. This objective medical evidence, combined with Jackson's subjective account of pain, prompted Jackson's neurosurgeon to conclude that Jackson is unfit to work, even in a sedentary role. If this were the only evidence in the record, Jackson might have a valid claim that Broadspire's denial was arbitrary and capricious. But the record also contains contrary evidence—including objective medical evidence—showing that Jackson can fully perform sedentary work. NEBC and Broadspire retained five physicians to examine Jackson or to evaluate his medical history, and all five concluded that his physical symptoms would not keep him from working at the sedentary level. Several of those physicians appear to have based their conclusion—at least in part—on Jackson's 2015 FCE. That objective test revealed that Jackson could complete more than 88% of the tasks to perform at the sedentary level, even though it also revealed that he was holding back during approximately 33% of the test.

We cannot read MRI scans or evaluate the results of an FCE, much less determine which piece of objective medical evidence is more persuasive, although this is exactly what Jackson wants this court to do. In effect, he asks us to reweigh the objective medical evidence and reach an outcome that supports his disability claim, despite Broadspire's decision to the contrary. Under our arbitrary and capricious standard, however, we cannot overturn an administrator's decision simply because there is substantial evidence that could have supported a different outcome. *See, e.g., Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). So long as there is a reasoned explanation, based on the evidence, for an administrator's decision, that decision is not arbitrary and capricious. *See, e.g.*, *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009).

Broadspire's decision meets that standard. First, the FCE test, which we have described as "a reliable and objective method of gauging the extent one can complete work-related tasks," provided the physicians who examined Jackson's claim with an objective measure of Jackson's ability to work. *Shaw*, 795 F.3d at 548 (internal quotation marks and citation omitted); *see also Caesar v. Hartford Life & Accident Ins. Co.*, 464 F. App'x 431, 435 (6th Cir. 2012); *Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 549 (6th Cir. 2006). Relatedly, the five physicians whom NEBC and Broadspire retained to examine Jackson and evaluate his physical condition independently determined that he could function at the sedentary level, and two psychiatrists found Jackson mentally fit to work. This evidence supplies a clear, reasoned explanation for Broadspire's decision.

Although we cannot reweigh the objective medical evidence, we can evaluate the process by which Broadspire reached its decision. *See, e.g., Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008). An administrator acts in an arbitrary and capricious manner when it "engages in a selective review of the administrative record" to justify its rejection of a disability claim. *See Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (internal quotation marks and citation omitted). But the physicians whom NEBC and Broadspire hired to evaluate Jackson's claim engaged in a comprehensive review of the record—including the objective medical evidence that Jackson advanced. Indeed, two neurosurgeons, Luc Jasmin, M.D., Ph.D., and Phillip Williams, M.D., reviewed all of Jackson's medical files and independently determined that the record lacked compelling objective evidence to support Jackson's claim. And Williams, who participated in the fifth and final review of Jackson's claim, assessed Jackson's most recent MRI scans, which showed additional disc degeneration—but nonetheless concluded that Jackson's condition would not have caused any work restrictions or limitations.

Although Jackson's personal physicians, Dr. Lee and Dr. Sack, concluded that he was unable to function at the sedentary level, their opinions are not dispositive: a plan administrator need not "accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Even so, the record reveals that NEBC and Broadspire took Lee's and Sack's opinions seriously. Indeed, Jasmin, a neurosurgeon whom NEBC retained to evaluate Jackson's condition, reviewed Lee's treatment of Jackson and made three separate attempts to contact Lee and discuss Jackson's history.[3] In any event, Jasmin disagreed with Lee's conclusion and stated that there is "no reliable, valid, and reasonably compelling evidence that [Jackson] has impairments preventing him" from performing sedentary work. (R. 24–4, Association Program Letter at PageID #619.) Similarly, Williams, the neurosurgeon whom Broadspire retained to review Jackson's medical history, wrote that Lee's conclusion "is not supported by objective findings." (R. 37, Broadspire Report at PageID #2515–16.) That Broadspire ultimately relied on Jasmin's and Williams's opinion—as opposed to that of Lee—does not render Broadspire's decision arbitrary and capricious. As we have observed:

> [W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

Finally, Jackson claims that the district court erred by not discounting the findings of Dr. Friedman, the only NEBC or Broadspire-retained physician to physically examine Jackson. Because Friedman examined Jackson in 2015, before later MRI scans showed further disc

---

[3] Dr. Jasmin's attempts to contact Dr. Lee did not succeed; Dr. Lee never returned Dr. Jasmin's voicemails.

degeneration in his cervical and lumbar spine, Jackson argues that Friedman's opinions should carry no weight. If the district court had set aside Friedman's opinion, Jackson's argument goes, the administrative record would have contained only the opinions of physicians who reviewed Jackson's medical file—but no opinions of physicians who examined Jackson in person. Jackson contends that this would have rendered Broadspire's decision a mere file review and thus arbitrary and capricious.

Jackson's argument is unavailing for several reasons. First, Friedman's medical opinion is not invalid simply because Jackson underwent an MRI of his cervical and lumbar spine several months after the physical examination. It is not clear that Friedman, a physical medicine and rehabilitation specialist, would have even reviewed or based his decision on the MRI scans. NEBC and Broadspire retained two separate neurosurgeons for the express purpose of evaluating Jackson's neck and back condition and reviewing Jackson's MRI scans. One of those neurosurgeons, Dr. Williams, reviewed Jackson's 2016 MRI scans and still concluded that Jackson was capable of performing sedentary work. Second, Friedman's medical opinion was just one piece of a vast administrative record, much of which contains evidence supporting Broadspire's decision. Even without Freidman's assessment, there is substantial evidence—including objective medical evidence—supporting Broadspire's denial of Jackson's claim.

Finally, we note, contrary to Jackson's suggestion, that the district court's decision is not at odds with *Godmar v. Hewlett-Packard Co.* 631 F. App'x 397 (6th Cir. 2015). In *Godmar*, we concluded that the plan administrator's decision was arbitrary and capricious, in part, because the administrator relied exclusively on file reviews to deny a claim. There, the claimant sustained "traumatic injuries to his left leg," for which he underwent nine surgeries and experienced significant pain, ultimately leading to his addiction to pain medication. *Id.* at 398–99.

12

Notwithstanding the claimant's complaints of pain, the doctors who reviewed his medical history determined that he was not disabled, and the plan administrator rejected his claim—without ever retaining a physician to examine the claimant in person.[4]  Although we stated that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," we cautioned that a plan administrator's decision to not conduct a physical examination of a claimant—particularly one with subjective complaints of pain—raises questions about the thoroughness and accuracy of its final determination.  *Id.* at 406 (internal quotation marks and citations omitted).  And we explained that "[f]ile reviews are particularly troubling when the administrator's consulting physicians—who have never met the claimant—discount the claimant's limitations as subjective or exaggerated." *Id.*

Here, the record reveals that Broadspire based its decision on more than just file reviews.  Indeed, NEBC and Broadspire considered the opinion of Dr. Friedman, who examined Jackson in person, as well as objective evidence of Jackson's ability to perform sedentary work, including two FCEs and multiple MRIs of Jackson's cervical and lumbar spine.  Its final conclusion was not simply a "credibility determination," as we described the plan administrator's decision in *Godmar*. *Id.* at 408.  Jackson's reliance on *Godmar* is unpersuasive here.

## V.

We agree with the district court's conclusion that the denial of Jackson's claim was not arbitrary or capricious.  For these reasons, we AFFIRM.

---

[4] Notably, the file reviewers declined to perform a FCE test on the claimant.  *Godmar*, 631 F. App'x at 405.