JEFFREY S. WHITE, United States District Judge
Now before the Court are cross-motions for judgment by Plaintiff Bruce Filarsky and Defendant Life Insurance Company of North America ("LINA"). Having reviewed the administrative record and the parties' arguments, and based on the Court's findings of fact, the Court concludes LINA wrongfully determined Dr. *930 Filarsky was not disabled and incorrectly denied him benefits under the terms of the long-term disability policy. The Court therefore GRANTS IN PART and DENIES IN PART Dr. Filarsky's motion for judgment and DENIES LINA's motion for judgment.
BACKGROUND
A. Dr. Filarsky's Background and Occupation .
Dr. Filarsky is a sixty-one-year-old obstetrician and gynecologist at The Kaiser Permanente Medical Group, Inc. ("Kaiser"). (Dkt. No. 30-1 (Administrative Record ("AR")) 1, 858, 1065.) He has worked at Kaiser in that capacity since 1988. (Id. ) On December 21, 1990, Dr. Filarsky underwent posterior cervical spine fusion, and, on June 30, 2010, lumbar spine fusion. (Id. 1065.) [1] Due to complications from these events, beginning June 2010, Kaiser permanently removed Dr. Filarsky from "night call" and from providing labor and delivery, postpartum, and emergency room care. (Id. ) Further, from June 2010 to November 2011, Dr. Filarsky was prohibited from providing clinical, surgical, and post-operative hospital care. (Id. 1065.)
In November of 2011, Kaiser provided accommodations for Dr. Filarsky (including exam room modifications in effect as of the time the parties submitted their briefings) so that he could work in the clinic. Even with these modification, Dr. Filarsky was unable to work in the operating room due to his inability to stand for lengthy periods of time.[2] (Id. ) Dr. Filarsky has been unable to work in the operating room or provide post-operative care to patients since November of 2012. (Id. ) As of the parties' filings, Dr. Filarsky's job description included: clinical obstetric and gynecological care, consulting for the clinic's nurse practitioner, and acting as department technical lead (a primarily instructional position). (Id. ) To accomplish these responsibilities, Dr. Filarsky must repetitively stand, sit, walk, reach, grasp, grip, push, pull, and bend. (Id. 1065-66.)
On January 7, 2015, Dr. Filarsky underwent hip replacement surgery. (Id. 225, 1163, 1175.) Following the procedure, Dr. Filarsky returned to work part-time for four hours a day from April 6, 2015 through April 16, 2015. (Id. 1201.) From April 17 to April 21, 2015, Dr. Filarsky, though technically cleared to work four hours a day, left after two hours each day due to pain. (Id. ) From April 22 to May 17, 2015, on Dr. Ronald Stradiotto's recommendation,[3] Dr. Filarsky took time off from work to recuperate. (Id. ) On May 18, 2015, Dr. Filarsky returned to work. (Id. ) From June 15, 2015 to the time of the parties' filings, Dr. Filarsky has worked twenty to twenty-four hours each week. (Id. )
B. The Policy.
Dr. Filarsky holds a long-term disability policy ("Policy") through LINA. (Id. 1323-58.) [4]
*931 Under the Policy, a disability exists "... if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings." (Id. 1337.) "Covered Earnings," under the Policy, are an employee's "prorated base compensation" in effect immediately prior to the date the disability begins. (Id. ) "Indexed Covered Earnings" are equal to "Covered Earnings" for the first twelve months of disability payments; after the first twelve months of payment, "Indexed Covered Earnings" increase periodically following a formula outlined in the Policy. (Id. 1353.)
An employee must wait six months from the beginning of his disability before he can make a claim under the Policy. (Id. ) Calculated from January 4, 2015[5] , Dr. Filarsky became eligible for disability benefits under the Policy on July 4, 2015. (Id. 197-98.) Dr. Filarsky's base compensation as of July 1, 2015[6] was $317,856. (Id. 1051.)
C. Surgical Recovery and Claim History.
X-rays taken approximately one month after Dr. Filarsky's hip surgery indicated the stabilizing hardware from the replacement was intact. (Id. 464-65.) Later, on April 20, 2015, by email to Dr. Filarsky, Dr. Stradiotto confirmed that the x-rays "look[ed] good" and admonished that "everyone heals at a different rate." (Id. 583.) Dr. Stradiotto recommended Dr. Filarsky bicycle as a way to increase activity and endurance. (Id. ) Finally, Dr. Stradiotto offered to amend Dr. Filarsky's "work slip" as needed. (Id. )
Dr. Filarsky responded the next day, noting that working four hours "was a struggle" and that working two-hour days "wasn't much better." (Id. 582-83.) He wrote that he'd been riding a stationary recumbent bicycle, but that walking "any significant distance" was difficult. In closing, he stated that he thought he needed "more time off work, but I have no idea how much." (Id. )
Dr. Stradiotto recommended that Dr. Filarsky take another six weeks off. (Id. 582.) Dr. Filarsky responded that six weeks was "reasonable," but opined "Maybe it will take less than that." (Id. 581.) Very shortly thereafter, Dr. Filarsky emailed Dr. Stradiotto again: "Rather than just putting me off work for six weeks, can you please send me this week for an evaluation, then write a note for 2-3 weeks, and then see me back for re-evaluation in 2-3 weeks?" (Id. ) Dr. Stradiotto agreed. (Id. 579.)
On April 23, 2015, Dr. Filarsky, as scheduled, saw Dr. Stradiotto. (Id. 588-90.) Dr. Stradiotto noted that the incision at *932 the site of the hip surgery was clear, that there was minimal "trendelenburg gait,"[7] and that Dr. Filarsky was using a cane to walk, despite suffering no rotation-related pain. (Id. 588.) Dr. Stradiotto also noted that Dr. Filarsky's rehabilitation was "going slowly" and that Dr. Filarsky had been attempting to work four hours a day since April 6, 2015, but was "just wipped [sic] out." (Id. ) Dr. Stradiotto noted that he would re-evaluate Dr. Filarsky the week of May 12, 2015. (Id. )
After the April 23 appointment, Dr. Filarsky emailed Dr. Stradiotto to ask that the two-hour work restriction Dr. Stradiotto had recommended during the appointment be accurately reflected on his paperwork:
Hi Ron. Thanks again for taking the time to see me today. So sorry to bother you, but when your MA reprinted my work slip to add the two-hour restriction, she left off the very important comments and also she checked the the [sic] that I would be returning to work at 'full capacity', which is not true. Sorry, but I need these corrected before I can submit this. Thanks so much. --Bruce.
(Id. 602.)
On May 6, 2015, Dr. Filarsky saw physical therapist Kyla Russell. (Id. 1289.) She noted that Dr. Filarsky was still troubled by weakness in his right leg when using stairs and that he was working two hours a day. (Id. 508.) She noted that his range of motion was "doing well," but that his gait was impaired. (Id. )
On May 27, 2015, Dr. Filarsky saw Dr. Mark Charney, another orthopedic surgeon, who documented that Dr. Filarsky was working two hours per day. (Id. 629, 859.) Dr. Charney further documented that Dr. Filarsky's rehabilitation was "going slowly" but that he was no longer using a cane. (Id. ) Dr. Filarsky told Dr. Charney that he had numbness on part of his right thigh and that he was experiencing "some back pain." (Id. ) Dr. Charney noted "minimal" trendelenburg gait but decreased sensation in Dr. Filarsky's right thigh. (Id. ) Dr. Charney made additional notations regarding Dr. Filarsky's slow recovery and appeared to question whether denervation, sciatica[8] , "muscle trauma," and neuropraxia[9] might be factors. (Id. ) Dr. Charney set a "plan" for Dr. Filarsky's continued recuperation, including exercise, and increasing "activity" to four hours per day. (Id. ) On May 28, 2015, Dr. Charney emailed Dr. Filarsky: "I think with time your hip will get better. Continue increasing your activity slowly as you are able. Try to walk a little farther every week. Just a little at a time." (Id. 638.) The May 27, 2015 Work Status Report indicated that Dr. Filarsky should work no more than four hours per workday. (Id. 1233.)
On June 2, 2015, Dr. Filarsky re-visited Ms. Russell. (Id. 644-646.) Ms. Russell noted slight right glute atrophy, a mild trendelenburg gait, and Dr. Filarsky's complaints of hip tightness and weakness in his right leg. (Id. 644.) Ms. Russell also *933 noted that Dr. Filarsky planned to return to four hours of work a day "a couple of weeks" from the date of the appointment. (Id. 644.) On June 15, 2015, Dr. Filarsky resumed a four-hour workday. (Id. 1233.)
In July of 2015, Dr. Dennis Korpman, for LINA, reviewed Dr. Filarsky's records and remarked that "with a reasonable degree of medical certainty, limitations and restrictions for physical impairment are supported." (Id. 120.) Like Dr. Filarsky's treating physician, Dr. Korpman observed that Dr. Filarsky's slow recovery was possibly due to denervation or sciatica. (Id. ) Dr. Korpman recommended reassessing Dr. Filarsky in four weeks. (Id. 121.) In a letter dated July 22, 2015, LINA approved Dr. Filarsky's claim for disability benefits. (Id. 197-98.)
On July 30, 2015, Dr. Filarsky submitted a Disability Questionnaire[10] stating he had "mobility issues and pain from his neck, lower back, right hip [and] thigh." (Id. 856.) The Questionnaire also indicated he could not walk or stand for "significant periods," but that he was able to drive and was working twenty hours a week. (Id. ) Dr. Filarsky further disclosed he operated a small aircraft as a hobby and remarked that his home was one story.[11] (Id. )
On August 21, 2015, Dr. Stradiotto examined Dr. Filarsky again. (Id. 847-51.) He noted Dr. Filarsky had "moderate neck stiffness," that "walking [was] uncomfortable" for him, and that he had continued numbness and shooting pains in the postoperative thigh. (Id. 847.) Dr. Stradiotto noted there was no evidence of either a trendelenburg gait or antalgia.[12] (Id. ) Dr. Stradiotto further reported that Dr. Filarsky's motor function was five-out-of-five and that his hip replacement was still properly aligned, and he indicated Dr. Filarsky's "slow recovery" was due to neuropraxia. (Id. 841, 847.)[13]
That same day, Dr. Stradiotto submitted a Work Status Report indicating that Dr. Filarsky could work no more than four hours each day. (Id. 774, 1234.) The same Work Status Report indicated that Dr. Filarsky could stand and walk for seventy-five percent of that time; bend at the waist and twist his torso and spine fifty percent of that time; and could lift, carry, push, and/or pull no more than thirty pounds. (Id. ) Dr. Stradiotto recommended that these restrictions (which, as in prior Work Status Reports, were intended to supplement any pre-existing workplace restrictions) remain in place from August 21, 2015 through January 3, 2016. (Id. )
On September 14 and 15, 2015, Dr. Korpman reviewed Dr. Filarsky's updated medical records for LINA and tried unsuccessfully to contact Dr. Stradiotto to discuss the August 21, 2015 examination. (Id. 100-02.) On September 15, 2015, LINA referred Dr. Filarsky's case to the Special Investigations Unit because LINA believed Dr. Filarsky had requested "excessive" limitations and because of his "extended"
*934 post-surgery recovery period. (Id. 94, 705-06.)
D. Surveillance Video.
LINA contracted with PhotoFax, Inc. ("PhotoFax"), a third-party vendor, to conduct video surveillance of Dr. Filarsky over a period of three days from October 8 to 10, 2015. (Id. 707-28, 1360.) The surveillance video shows the following.
On October 8, 2015:
• At 8:08 a.m., Dr. Filarsky arrived at Kaiser Permanente, his workplace. He departed Kaiser and walked to his car just before 1:00 p.m. (Id. 714, 1360.)
• Dr. Filarsky ate lunch at a fast food restaurant. (Id. 714-15, 1360.) During his lunch, he occasionally bent forward or leaned his head backward to take bites of his food or to drink. (Id. ) Once, he bent over to pick up an unidentified item. (Id. )
• At 1:30 p.m., Dr. Filarsky arrived at the airport where he stores his plane. (Id. 715, 1360.) Dr. Filarsky walked to and from the hangar, stood and talked to an individual, and then re-entered his car. (Id. 1360.)
• From 4:03 p.m. to 4:15 p.m., Dr. Filarsky purchased an unidentified small item at a hardware store. (Id. 1360.) In so doing, he walked from his car and through the store. (Id. 1360.)
• At 4:20 p.m., Dr. Filarsky arrived again at his place of work. He remained inside for approximately fifteen minutes and then walked to his car and left. (Id. 717, 1360.)
On October 9, 2015:
• Dr. Filarsky drove from his home to the airport where he stores his plane. (Id. 719, 1360.) He arrived at the airport at 7:19 a.m. (Id. )
• Several times during his time at the airport, Dr. Filarsky walked back and forth between structures, occasionally retrieved items from his car trunk, and opened and closed a gate. (Id. 1360.) At one point, Dr. Filarsky put a sun visor up in his car's windshield. (Id. )
• From 2:00 p.m. to 2:20 p.m., Dr. Filarsky drove his plane out of his hangar, stepped out of the plane, and placed a couple of small objects in the plane. He then climbed back into the plane, drove it down the runway and took off. (Id. 723-24, 1360.)
• At approximately 2:59 p.m., Dr. Filarsky, having landed, drove the plane up to the hangar, got out of the plane, retrieved a tow bar from a side compartment, and used the tow bar to push the plane out of the frame. (Id. 1360.) Less than thirty minutes later, Dr. Filarsky left the airport in his car. (Id. )
• Dr. Filarsky did not work on October 9, 2018. (Id. 1188, 1196.)
On October 10, 2015, PhotoFax did not observe Dr. Filarsky leaving his home and obtained no video of him. (Id. 725-26.)
On October 21, 2015, Dr. Filarsky spoke to a LINA vocational analyst. (Id. 82-83.) He reported neck and back pain and neuralgia in his thigh. (Id. 83.) The vocational analyst noted in her report that Dr. Filarsky had limited tolerance due to pain and low stamina. (Id. 82.) She also noted that his office had already accommodated him with an ergonomic work station. (Id. ) On December 18, 2015, Dr. Stradiotto submitted an updated Work Status Report recommending again that Dr. Filarsky work no more than four hours a day. (Id. 1235.) Prior Work Status Reports applied to increments ranging from one month to almost *935 five months in length.[14] (See, e.g. , id. 774, 1150, 1154, 1230-35, 1301, 1303.) The December 18 Work Status Report projected limitations for nearly a full year (from January 4, 2016 to December 30, 2016). (Id. 1235.)
E. Discontinuing Disability Benefits.
On October 27, 2015, Dr. Evan Rashkoff reviewed certain of Dr. Filarsky's medical and physical therapy records, the PhotoFax surveillance report and video, and documents related to his disability claim. (Id. 675-79.) Dr. Rashkoff concluded: (i) Dr. Filarsky had not been functionally limited since May 7, 2015, (ii) Dr. Filarsky did not require any work activity restrictions; (iii) Dr. Filarsky's convalescence was unusually long for hip replacement; (iv) that a nerve palsy would not have added to his limitations; and (v) that Dr. Filarsky's physical activity in the surveillance video was inconsistent with his claimed workplace functional limitations. (Id. 677-78.) Dr. Rashkoff opined that Dr. Filarsky "moves and uses his upper and lower extremities like a person with no impairments." (Id. ) Dr. Rashkoff did not examine Dr. Filarsky. (Id. 675-79.)
Dr. Aubrey Swartz, on the other hand, did conduct an in-person independent medical examination ("IME") of Dr. Filarsky. (Id. 658.) During Dr. Swartz's December 2, 2015 examination, Dr. Filarsky reported pain from his neck, right hip, and lower back. (Id. ) Dr. Swartz reviewed clinical summary forms and progress reports from Kaiser, including Dr. Filarsky's pre-and post-operative examinations and physical therapy records. (Id. 661.) Dr. Swartz then reviewed Dr. Stradiotto's August 31, 2015 report, Dr. Rashkoff's peer review report, the surveillance report, "stills" from the surveillance video, and the surveillance video itself. (Id. 662-663.) Dr. Swartz noted that "[t]here did not appear to be any hesitation, grimacing, or slowing down on the basis of pain during the sequences of video...." (Id. 663.) Dr. Swartz concluded that Dr. Filarsky was capable of greater physical function and capacity than he claimed and capable of working eight hours a day. (Id. 666-70.)
In a letter dated December 23, 2015, based upon the surveillance video, Dr. Rashkoff's review, and Dr. Swartz's examination and review, LINA informed Dr. Filarsky that it would not continue to pay disability benefits under the Policy beyond December 31, 2015. (Id. 172-74.) This letter quoted two definitions of disability-one from the Policy and another from an unknown source.[15] (Id. 172-174.) Dr. Filarsky's disability benefits were terminated effective December 31, 2015. (Id. 1051.)
F. Dr. Filarsky Appeals LINA's Decision.
On March 14, 2016, Dr. Filarsky appealed, by letter, LINA's termination of his benefits. (Id. 1173-1322.) This letter included twenty-seven[16] annotated exhibits, including an additional statement from Dr. *936 Stradiotto, X-rays and medical notes from 2011, X-rays and an MRI from February 2016, and a "problem list" dated July 2, 2015 that described disc degeneration and cervical joint problems. (Id. ) The letter further described the modifications Dr. Filarsky adopted due to his physical discomfort and limitations. For example, Dr. Filarsky listed the accessories he had purchased before and after his back and hip surgeries in order to ease his neck, back, and hip pain. (Id. 1183.)
Dr. Filarsky recounted several ways in which his occupation was physically difficult for him. Much of his discomfort and fatigue stemmed from small or subtle repetitive motions completed over long stretches of time: refocusing his glance, changing the direction of his gaze to conduct an exam, shifting position from computer to patient, and tilting and turning his head from side to side. (Id. 1186-87.) Dr. Filarsky also observed that, during his shifts, he was required to be up and down on his feet and had limited control (dictated by the nature and completion of a task) over when he was able to stand or sit. (Id. 1187.) He observed that as he became tired through the day, his pain intensified. (Id. )
Dr. Filarsky noted that the peer reviews appeared to overlook what he deemed key portions of his physical therapy records (notations referencing his lumbar issues and gait) and facts contained in Work Status Reports (particularly work restrictions already in place) and emails with Dr. Stradiotto. (Id. 1200, 1285, 1291, 1294.) Dr. Filarsky also noted that Dr. Rashkoff's peer review contained several errors: referencing antibiotics Dr. Filarsky was not prescribed, misstating work-related dates, mischaracterizing the contents and nature of paperwork and emails, confusing treatment goals with statements about Dr. Filarsky's actual condition, and describing components of the video that do not exist-primarily images of Dr. Filarsky "doing some heavy work on a plane." (Id. 1199-1202, 1284-88.)
Dr. Filarsky noted that Dr. Swartz's review incorporated portions of Dr. Rashkoff's analysis (including some errors) and that, though Dr. Swartz reviewed the video surveillance, Dr. Swartz's review inaccurately recounted some of the events in the footage (the location of his dining and the nature of the implement he used to push the plane). (Id. 1314-17.) Dr. Filarsky also took issue with Dr. Swartz's characterizations (i) that he had normal range of motion of his cervical and lumbar spines and in both hips and (ii) mild decrease in flexion in his hips. (Id. 1317.) Further, Dr. Filarsky stated that, after the exam with Dr. Swartz, he was in pain and that he would have been unable to perform the physical manipulations he completed during his examination with Dr. Swartz repetitively over a longer period of time. (Id. 1209.)
In support of Dr. Filarsky's appeal, on March 11, 2016, Dr. Stradiotto (again, Dr. Filarksky's treating physician) submitted a letter indicating he had reviewed both Drs. Rashkoff and Swartz's reports, but disagreed with their conclusions. In this letter, Dr. Stradiotto noted that the video surveillance did not capture repetitive movement of the kind entailed in Dr. Filarsky's occupation. (Id. 1212.) Dr. Stradiotto noted that Dr. Filarsky's main problems were stiffness in his lumbar and cervical areas-and that his back-related complaints "supercede[d]" his hip replacement. (Id. )
Dr. Stradiotto ordered and reviewed a new MRI and concluded that it showed increased flexion and extension, indications of a degenerative disk. (Id. ) He opined that in light of his findings and of Dr. Filarsky's complaints, he still considered Dr. Filarsky partially disabled. (Id. 1213.) Dr. *937 Stradiotto concluded by stating that he and Dr. Filarsky had discussed increasing his work hours up to six hours a day as tolerable. (Id. ) On April 14, 2016, Dr. Stradiotto updated Dr. Filarsky's workday restrictions from four hours five days a week to four hours four days a week and five hours one day a week. (Id. 1150.)
G. LINA Evaluates Dr. Filarsky's Appeal.
On March 21, 2016, Dr. Korpman, again for LINA, reviewed Dr. Rashkoff's peer review, Dr. Swartz's IME, a radiograph of Dr. Filarsky's hip from August 12, 2015, Dr. Stradiotto's exam notes from August 21, 2015, and Dr. Stradiotto's March 11, 2016 letter. (Id. 47-48.) Dr. Korpman concluded that Dr. Stradiotto's opinion was not "well supported" and was "inconsistent" with the available evidence in Dr. Filarsky's medical history. (Id. 48.) Dr. Korpman did not examine Dr. Filarsky. (Id. 47-49.)
On May 4, 2016, Dr. Clinton Bush, a board-certified orthopedic surgeon, conducted a peer review of the surveillance report, Dr. Filarsky's disability questionnaire, medical release, Dr. Swartz's IME, Dr. Filarsky's appeal, and Dr. Filarsky's medical records from November 19, 2012 through April 14, 2016. (Id. 1143-48.) Dr. Bush did not examine Dr. Filarsky. (Id. ) Dr. Bush concluded that Dr. Filarsky should be able to return to work full-time. (Id. 1146.)[17] On May 6, 2016, LINA affirmed by letter its denial of Dr. Filarsky's disability benefits. (Id. 157-59.)
On October 3 and 4, 2016, Dr. Filarsky participated in a functional capacity evaluation ("FCE") administered by Dr. Diana Bubanja. (Id. 1064-1136.) During the FCE Dr. Bubanja[18] and her staff conducted two "mock" workdays with Dr. Filarsky to ascertain his ability and stamina. (Id. 1081.) She also observed that Dr. Filarsky's pain and discomfort became worse with sustained or repetitive neck or back postures and that it was unlikely his condition would improve. (Id. 1092-93.) Dr. Bubanja concluded that Dr. Filarsky would be unable to work full-time as an ob-gyn because of his pain and fatigue. (Id. )
On October 27, 2016, Dr. Filarsky, through his attorney, filed another appeal. (Id. 1048-50.) On December 22, 2016, LINA commissioned a final peer review of Dr. Filarsky's claim. (Id. 1040-43.) Dr. Stanley Askin, a board-certified orthopedic surgeon, reviewed Dr. Filarsky's medical records, work status reports, the FCE, and other forms, and concluded that Dr. Filarsky should be able to return to work full-time. (Id. )
The Court will discuss additional facts as needed below.
ANALYSIS
A. Standard of Review and Burden of Proof.
The Policy is covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), because it is an employee benefit plan funded *938 by Dr. Filarsky's employer. By their cross motions for judgment, the parties ask this Court to conduct a bench trial on the administrative record. See Bigham v. Liberty Life Assurance Co. of Boston , 148 F. Supp. 3d 1159, 1161-62 (W.D. Wash. 2015). The parties agree that de novo review applies. See Rorabaugh v. Cont'l Cas. Co. , 321 Fed. App'x 708, 709 (9th Cir. 2009) (court may accept parties' stipulation to de novo review). Pursuant to the parties' agreement and Federal Rule of Civil Procedure 52, the Court conducts a bench trial based on the administrative record.
Under de novo review, the Court determines if the claimant has adequately established he is disabled according to the plan's terms, giving no deference to the claim administrator's decision to deny the claim. Muniz v. Amec Constr. Mgmt. , 623 F.3d 1290, 1295-96 (9th Cir. 2010). The Court therefore accords the administrator's evaluation of the evidence no "presumption of correctness." Perryman v. Provident Life & Acc. Ins. Co. , 690 F. Supp. 2d 917, 942 (D. Ariz. 2010). De novo review requires the Court to make findings of fact and to weigh the evidence, including the persuasiveness of conflicting testimony. See Walker v. Am. Home Shield Long Term Disability Plan , 180 F. 3d 1065, 1069 (9th Cir. 1999) (de novo review applies to plan administrator's factual findings as well as plan interpretation).
When a district court reviews a claim administrator's decision under a de novo standard of review, the burden of proof is on the claimant. Oldoerp v. Wells Fargo & Co. Long Term Disability Plan , 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014). A claimant must prove he is entitled to the benefits under his plan by a preponderance of the evidence. Armani v. Nw. Mut. Life Ins. Co. , 840 F.3d 1159, 1163 (9th Cir. 2016). The Court's present task is not to decide if the insurance company abused its discretion in denying benefits or if the decision was reasonable. See Muniz , 623 F.3d at 1295-96. Rather, the Court must decide if Dr. Filarsky has shown it is more likely than not that he was disabled as defined by the policy. See Sanchez v. Monumental Life Ins. Co. , 102 F.3d 398, 404 (9th Cir. 1996) (defining "preponderance of the evidence" as "more likely than not"). The Court concludes that Dr. Filarsky has met his burden.[19]
B. Definition of "Disabled."
The Court must explain which definition of "disabled" applies. Dr. Filarsky argues that he is entitled to benefits under the Policy if he falls under one of two definitions: the definition of "disabled" under the Policy or the second definition of "disabled" set forth in two letters from LINA related to his coverage. LINA argues that the definition in the Policy-and that definition alone-governs whether Dr. Filarsky is entitled to benefits. On this point, LINA is correct.
The facts here are remarkably similar to those in Earl v. Life Ins. Co. of N.A. , 204 Fed. App'x 592, 594 (9th Cir. 2006). In Earl , two non-managerial employees of the insurer mistakenly included a definition of the term "disability" in letters to a claimant that contradicted the definition found in the applicable insurance policy. Id. Further, the policy at issue in Earl (i) contained language stating the policy could not be modified by waiver or mistake of one of the insurance company's employees *939 and (ii) explicitly laid out the means by which the policy might be amended. Id. As the letters were sent by non-managerial employees, and as there was no evidence in the record that the policy's steps for amendment had been followed, the Ninth Circuit upheld the district court's determination that the definition originating in the policy-and not the definition appearing in a letter-governed.
Here, the Policy contains only one definition of "disability," and that definition is clear: a disability exists if, due to injury or sickness, a claimant (i) is "unable to perform all the material duties of his or her regular occupation" or (ii) "is unable to earn more than 80% of his or her Indexed Covered Earnings." (Id. 1337.) As in Earl , the letters LINA sent to Dr. Filarsky issued from employees, not company executives. (AR 172-74, 194-95.) Under the explicit terms of the Policy, these employees lacked the ability to bind LINA to amendments to the policy, including alternate definitions of key terms. (See id. 1351 ("No changes in the Policy will be valid until approved by an executive officer of the Insurance Company.... No agent may change the Policy or waive any of its provisions.").) Accordingly, the Court holds that the applicable definition of "disability" is the one contained in the Policy.
Dr. Filarsky's argument that California law's more expansive definition of disability governs is unavailing. The case upon which Dr. Filarsky primarily relies is Hangarter v. Provident Life & Acc. Ins. Co. , 373 F.3d 998, 1006 (9th Cir. 2004). Hangarter is a diversity action contending exclusively with California law and contending not at all with ERISA, which the parties agree governs the dispute at hand. Id. at 1003. Moreover, in Hangarter the Ninth Circuit specifically noted that when an insurance policy is part of an employee welfare benefit plan governed by ERISA, as it is here, "a plaintiff's state law claims relating to that policy are preempted and federal law applies to determine recovery." Id. at 1011 n.8 (citations omitted). Accordingly, here, where ERISA controls, California law does not govern the applicable definition of disability. See, e.g. , Brady v. United of Omaha Life Ins. Co. , 902 F. Supp. 2d 1274, 1283 (N.D. Cal. 2012). Dr. Filarsky must therefore prove by a preponderance of evidence that, due to injury or sickness "he ... [was] unable to perform all the material duties of his or her regular occupation, or ... he ... [was] unable to earn more than 80% of his ... Indexed Covered Earnings." (See AR 1337.)
C. Physician Evaluations, FCE, and Peer Review.
Dr. Filarsky's treating physicians and the physicians commissioned to review his case for LINA came to opposite conclusions regarding his physical abilities. The merit of the parties' arguments therefore hinge, in no small part, upon the weight the Court affords the physicians' reports and conclusions. The Court turns now to this question.
In ERISA cases, a court is not required to defer to a treating physician's opinion. Black & Decker Disability Plan v. Nord , 538 U.S. 822, 830-31, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). A treating physician's opinion may merit less weight where, for example, the relationship between the claimant and the physician has been "of short duration" or where a non-treating specialist has pertinent expertise that the treating physician lacks. Id. These considerations, however, do not mean that a court must disregard the opinion of a treating physician. See Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan , 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (opinions of treating physician *940 may remain reliable evidence). Indeed, the weight given to an examining physician's diagnosis depends upon: (i) the extent of the patient's treatment history; (ii) whether the examining physician specializes in the condition at issue; and (iii) how much detail the examining physician provides to support his conclusions. Shaw v. Life Ins. Co. of N. Am. , 144 F. Supp. 3d 1114, 1129-30 (C.D. Cal. 2015) (citations omitted).
Here, Dr. Filarsky relies most upon the opinion of his treating physician, Dr. Stradiotto.[20] At the time of the relevant examinations, in addition to performing Dr. Filarsky's hip replacement surgery, Dr. Stradiotto had treated Dr. Filarsky for musculoskeletal issues for approximately four years. (AR 1212.) He provided detailed accounts of the evolution of Dr. Filarsky's post-operative condition, evaluations of his gait, soreness, tightness, nerve issues, and strength. He saw Dr. Filarsky multiple times in 2015 and conducted a supplemental examination in 2016, including ordering and analyzing a new MRI. Dr. Stradiotto was also intimately acquainted with Dr. Filarsky's chronic spinal discomforts and was instrumental in helping Dr. Filarsky obtain workplace accommodations. Dr. Stradiotto further authorized Dr. Filarsky to work a partial day after post-surgical leave, rather than completely prohibiting Dr. Filarsky's return, and consulted with Dr. Filarsky, where possible, to tailor and increase the recommendation for his daily work hours. See Curtis v. Hartford Life and Accident Ins. Co. , 64 F. Supp. 3d 1198, 1218 (N.D. Ill. 2014) (treating physician gains credibility for recommending partial measure). Given Dr. Stradiotto's expertise, his familiarity with Dr. Filarsky's issues, and the records Dr. Stradiotto generated, the Court affords considerable weight to his opinions that Dr. Filarsky was unable to return to work full-time. See id. at 1215 (crediting opinion of physician who treated claimant for disabling condition monthly for over a year-and-a-half); see also Oldoerp , 12 F. Supp. 3d at 1255 (in-person medical examination may render more credible conclusions than paper-only review).
The Court finds the FCE's conclusions highly probative and persuasive. Dr. Filarsky's contention that he was unable to work full-time was and is based on the physical duress resulting from specific repetitive motions and fatigue from accumulated hours of work-not from singular incidences or episodes of exertion. Because the FCE entailed a simulation of two workdays, it provides a helpful snapshot of the pain, fatigue, and difficulty a typical workday inflicts. Cf. Oldoerp , 12 F. Supp. 3d at 1254 (certain self-reported symptoms and difficulties not easily verifiable by objective testing and therefore difficult to verify in single examination).
The Court is not persuaded by LINA's argument that the FCE is unreliable. LINA argues in part that the FCE is unreliable because the results of the muscle strength test conducted in the FCE were different than the muscle strength tests conducted by Dr. Stradiotto. (See AR 848, 1075-78.) Yet, these muscle strength tests were conducted over a year apart. (See id. 848, 1064.) It is, of course, entirely possible that Dr. Filarsky's muscles atrophied during that period, a fact which supports rather than undermines *941 Dr. Filarsky's position. The Court rejects any suggestion that FCEs are inherently unreliable and gives no credence to Dr. Askin's remark (AR 1042) that Dr. Filarsky's seeking an FCE suggests a reluctance to return to work. Courts and claims administrators commonly use FCEs to evaluate a claimant's condition. See, e.g. , Sterio v. HM Life , 369 F. App'x 801, 804 (9th Cir. 2010) (FCEs used as evidence in appeal of rejection of benefits).[21] As a tool, FCEs are not innately suspect.
Dr. Filarsky's treating physicians and the FCE relied, to an extent, upon Dr. Filarsky's subjective reporting of pain. LINA suggests that Dr. Filarsky's subjective reporting is unreliable, but relying on subjective reporting is permissible when the reporting is supported by the available evidence. Oldoerp , 12 F. Supp. 3d at 1254. Here, the evidence supports Dr. Filarsky's complaints.
As discussed above, Dr. Stradiotto observed on multiple occasions in 2015 various problems with Dr. Filarsky's gait and expressed suspicions that nerve-related issues were likely at the root of his evolving discomfort and pain, perhaps affecting the pace of his recovery. (See, e.g. , AR 456-63, 517-27, 539-43, 562-67, 558-610, 629-642, 786, 835-37, 847-51.) Dr. Stradiotto also commissioned and analyzed an additional MRI in 2016; he concluded the MRI confirmed Dr. Filarsky's physical complaints. In the FCE, Dr. Bubanja observed that Dr. Filarsky had difficulty with repetitive movements and with stamina. Notably, Dr. Filarsky's treating physicians nor Dr. Bubanja expressed confusion as to the pace of his recovery or reticence to believe Dr. Filarsky's subjective complaints of pain. Further, Dr. Filarsky's subjective reporting is bolstered by the evidence he submitted in support of his appeal documenting, for example, post-hip-surgery modifications to his household and habits to accommodate his physical condition.
The cases LINA cites to cast doubt on the reliance upon Dr. Filarsky's self-reported symptoms are distinguishable. In Biggar v. Prudential Ins. Co. of Am. , 274 F. Supp. 3d 954, 967-69 (N.D. Cal. 2017) and Seleine v. Fluor Corp. Long-Term Disability Plan , 598 F. Supp. 2d 1090, 1111 (C.D. Cal. 2009), for example, the claimants' subjective symptoms conflicted with the treating physician's assessments. In Bratton v. Metropolitan Life Ins. Co. , 439 F. Supp. 2d 1039 (2006), the treating physicians were "equivocal," noted the claimant had abilities consistent with the occupation at issue, and the claimant's contacts with the treating physician were "brief and sporadic." Here, Dr. Filarsky had frequent appointments with Dr. Stradiotto as well as a long treatment history, and Dr. Stradiotto's opinions that Dr. Filarsky was unable to return full-time to work were unequivocal. Finally, in Giordano v. Providence Health Sys. in Washington , 747 F. Supp. 2d 1137, 1145-46 (D. Alaska 2010), the Court found evidence of malingering, no objective evidence whatsoever of the complained-of malady, and the treating physician was not able to estimate the claimant's true functional capacity. Again, not so here. Moreover, in a number of the cases LINA cites, the standard of review applied is abuse of discretion and, accordingly, the reviewing court evaluated whether the insurer's decision was arbitrary and capricious-not whether the decision was correct. See, e.g. , Leipzig v. AIG Life Ins. Co. , 362 F.3d 406 (2004). A reasonable conclusion (one free of arbitrariness *942 and caprice) may in some cases be incorrect; therefore, such cases are helpful only to a point when reviewing LINA's denial of coverage.
Implicit in LINA's argument that Dr. Filarksy's subjective reporting is unreliable is the notion that Dr. Filarksy is a malingerer. There is absolutely nothing in the record to support such an assertion or, frankly, to undermine Dr. Filarsky's credibility. Dr. Filarsky was forthcoming and cooperative with insurance company representatives and employees. (See, e.g. , AR 667.) Even physicians contracted by LINA to review Dr. Filarky's records either (i) did not note malingering or (ii) specifically indicated there was no evidence of malingering. See Fleming v. Kemper Nat. Services, Inc. , 03-cv-5135-MMC, 2005 WL 839639, at *8 (N.D. Cal. April 11, 2005) (treating physicians notes did not show skepticism of reported symptoms and pain). Further, all evidence in the AR points to Dr. Filarsky's desire to return to work, but inability to do so. (See, e.g. , AR 581.)
Compared to Dr. Stradiotto's opinion and the FCE's conclusions, this Court gives less weight to the physicians that reviewed Dr. Filarsky's file for LINA. As described above, LINA marshalled review of Dr. Filarsky's medical records by five physicians: Dr. Korpman, evidently a LINA-affiliated physician, and Drs. Rashkoff, Swartz, Bush, and Askin, orthopedic surgeons working for third parties. Only one of these physicians, Dr. Swartz, examined Dr. Filarsky in person. While deference is not necessarily owed to treating physicians in ERISA cases, conclusions drawn at the end of in-person medical examinations are inherently more helpful because the physician observes and interacts with the patient for several minutes at a time. Salomaa v. Honda Long Term Disability Plan , 642 F.3d 666, 676 (9th Cir. 2011) (medical opinions rendered after in-person examination more persuasive that contrary opinions rendered following paper-only review of records). Compared with the lengthy in-person examinations by Dr. Stradiotto and the FCE, the opinions of these physicians, Dr. Swartz excepted, are less helpful to the Court.
Of course, there is nothing inherently wrong with a peer review, even if conducted solely on paper. See Godmar v. Hewlett-Packard Co. , 631 Fed. App'x 397, 406 (6th Cir. 2015). Yet, where the claim administrator's consulting physicians-most of whom did not personally examine Dr. Filarsky-discount his self-reported limitations as unsupported, subjective, or exaggerated, as they have done here, the Court finds such reviews "particularly troubling." See id. The five physicians that conducted reviews of Dr. Filarsky's file for LINA could only have reached their collective conclusions by disregarding Dr. Filarsky's self-reported symptoms. That they did so without evidence of malingering or evidence that tended to undermine his credibility corrodes the reliability of their conclusions. See Demer v. IBM Corp. , 835 F.3d 893, 905 (9th Cir. 2016) (implicit in disregard of self-reported symptoms is doubt about patient's credibility, particularly where no in-person examination).
Two of the five peer reviews merit additional discussion. Dr. Rashkoff's peer review, first in time during the investigation of Dr. Filarsky's claim, contains multiple misstatements, some of which have direct bearing on the question of Dr. Filarsky's physical ability. By way of illustration, Dr. Rashkoff's report remarks that Dr. Filarsky was filmed doing heavy work on his plane, but the surveillance video contains no such footage. (AR 678, 1360.) The factual inaccuracies in Dr. Rashkoff's report that do not have direct bearing on the *943 question at hand[22] give the Court the impression that Dr. Rashkoff reviewed Dr. Filarsky's medical files quickly and cursorily, undermining the reliability of his conclusions. Given the nature of multiple peer reviews, such misstatements have a ripple effect in the record. For instance, the credibility of Dr. Swartz's report, though Dr. Swartz examined Dr. Filarsky in person, is similarly eroded due to its reliance upon and incorporation of some of Dr. Rashkoff's erroneous observations. (See AR 1310-17.)
Dr. Rashkoff's report is troublesome for an addition reason: it contradicts, without explanation, Dr. Korpman's initial assessment (on behalf of LINA) of Dr. Filarsky's disability. Dr. Korpman, as discussed above, on July 15, 2015 recommended approval of benefits for at least one month. (AR 819.) Dr. Rashkoff's report, however, later opined that Dr. Filarsky had no functional limitations as of May 7, 2015-over two months before Dr. Korpman's assessment. (Id. 677-78.) The record and LINA's briefing are silent as to how Drs. Rashkoff and Korpman came to such different conclusions about Dr. Filarsky's physical state.[23]
Dr. Swartz is the lone LINA-commissioned reviewer to have examined Dr. Filarsky. However, the Court finds that evidence in the AR outweighs Dr. Swartz's dissenting opinion, particularly, again, as Dr. Swartz dismissed Dr. Filarsky's subjective complaints of pain without evidence of malingering.
D. Surveillance Video.
LINA argues that the surveillance video obtained in October of 2015 demonstrates Dr. Filarsky was able to return to work full-time. The Court disagrees. After multiple careful reviews of the surveillance video, the Court finds that the activities the surveillance team captured are within Dr. Filarsky's operative work restrictions and described limitations. (See, e.g. , AR 1193-96, 1360.) The surveillance video does not show Dr. Filarsky doing any of the aggravating repetitive motions that, when undertaken over prolonged periods of time,[24] cause him pain, discomfort, and fatigue. See Maher v. Mass. Gen. Hosp. Long Term Disability Plan , 665 F.3d 289, 294-95 (1st Cir. 2011) (surveillance useful where data gathered does not conflict with self-reported limitations or potentially anomalous bursts of activity); see also Montour v. Hartford Life & Acc. Ins. Co. , 588 F.3d 623, 633 (9th Cir. 2009) (activity captured on surveillance not inconsistent with reported limitations).
As captured by the surveillance video, Dr. Filarsky short distances, got in and out of his car, opened and closed his car door, and removed items from his trunk. (AR 1360.) For less than half an hour, he *944 ate fast food while seated and ran a quick errand at a hardware store. (Id. ) He walked to and from the airplane hangar, placed small seemingly lightweight objects in the plane, climbed into the plane,[25] and flew it for less than an hour. (Id. ) None of these activities, particularly in the short bursts the investigators observed, contradict Dr. Filarsky's assertions that he has difficulty walking or standing for prolonged periods of time or that several hours of continuous activity involving repetitive movements causes him pain and fatigue that prevents him from working. (Id. 1187.)
LINA makes much of the sequence of events during the first day of surveillance, noting that Dr. Filarsky "worked" for four hours and then spent several hours at the hangar and running errands. Yet, the first day of surveillance does not demonstrate Dr. Filarsky's fitness to return to work full-time. First, the video captures Dr. Filarsky going into the building where he works and then coming out approximately five hours later, but the surveillance does not capture Dr. Filarsky's activity inside. He could have been incredibly physically active, or he could have had a slow day with few patients: the Court cannot know because the surveillance video does not capture what happened behind the walls of Dr. Filarksy's workplace. Second, even assuming arguendo that Dr. Filarsky had a usual workday with typical movements and physical stressors, the fact that the surveillance team observed one unusually "active" day does not prove that Dr. Filarsky is not disabled under the terms of the Policy. See Langlois v. Metropolitan Life Ins. Co. , No. 11-cv-3472-RMW, 2012 WL 1910020, at *13 (N.D. Cal. May 24, 2012) ("claimant with 'good days and bad days' may be sufficiently disabled to merit an award of benefits").
The cases LINA cites concerning the weight of surveillance evidence are distinguishable. In DeBenedictis v. Hartford Life & Acc. Ins. Co. , 701 F. Supp. 2d 1113, 1120-21, 1126-27 (D. Ariz. 2010), the claimant was observed "literally hopping in and out" of his high-off-the-ground truck and walking with no difficulty, where he had claimed he was incapable of walking for three blocks, could shop for fifteen minutes "at the most," could only stand for fifteen to twenty minutes and reported specifically that "he had to pull on the roof, grab the handle and stand on the step bar to enter" his truck. In Bender v. Hartford Life Ins. Co. , No. 09-cv-1163-MMC, 2011 WL 3566483, at *14, (N.D. Cal. Aug. 12, 2011), the claimant had maintained she was unable to sit or stand for longer than ten minutes, but investigators observed her walking around a market for forty minutes, shopping for thirty-five minutes, sitting in her car for thirty minutes, and walking around her yard for thirty minutes. Unlike these claimants, Dr. Filarsky was not observed doing activities he claimed he was unable to do. See Prado v. Allied Domecq Spirits & Wine Grp. Disability Income Policy , 800 F. Supp. 2d 1077, 1099 (N.D. Cal. 2011) (surveillance no "smoking gun" where activity observed not inconsistent with claimant's self-reported activity).
The integrity of the video itself and the accompanying report merit some attention. Dr. Filarsky has argued that the surveillance video was manipulated (sped up and distorted) and is therefore unreliable. As briefly discussed above, the video surveillance of Dr. Filarsky is not continuous. Because the time stamp on the video does *945 not have a second counter, the Court, with a stopwatch, timed certain pieces of continuous footage occurring between observable changes of the time-stamp counter-in other words, where the time-stamp counter could be understood to have represented a minute of non-stop footage. For most of these clips, a minute on the time-stamp counter did indeed last sixty seconds (give or take a fraction of a second, which may be accounted for by the Court's slow reflexes). Notably, the Court consistently timed one clip at fifty-six seconds. (Id. 1360, 1:19 pm to 1:20 pm). One aberrant clip, however, does not lead the Court to conclude that the video was "doctored." Thus, the Court finds that the video, as it exists in the record , has not been manipulated with respect to its aspect ratio or speed. (Id. )[26]
PhotoFax also produced a written summary of the surveillance video. The report is useful for the Court in that it contextualizes sequences of video that otherwise would not make very much sense, but the report contains inaccuracies. For example, the report states that Dr. Filarsky missed his appointment for an IME on October 9, 2015 (the second day of surveillance) but Dr. Filarsky had rescheduled the IME to December 2, 2015. (Id. 706, 709, 1198.) The report also states that Dr. Filarsky's home is two stories, when, in fact, it is one story. (Id. 712.) Due to the inaccuracies in the surveillance report, and the availability of the surveillance video, the Court afforded the report itself little weight.
E. Dr. Filarsky "Disabled" Under Policy.
Considering all the evidence in the record, and giving the various components the appropriate weight, the Court holds that Dr. Filarsky has proven by a preponderance of evidence that the work restrictions imposed by his treating physician, Dr. Stradiotto, were warranted.[27] As discussed above, under the Policy, "[a]n employee is Disabled if, because of Injury or Sickness, he ... is unable to perform all the material duties of his ... regular occupation, or solely due to Injury or Sickness, he ... is unable to earn more than 80% of his or her Indexed Covered Earnings." (Id. 1337.) The Policy poses this definition in the disjunctive, meaning that the existence of either circumstance (inability to perform material duties or inability to earn more than 80% of indexed covered earnings) is sufficient to deem a claimant disabled. Dr. Filarsky has submitted evidence that the work restrictions in place from January 1, 2016 to the time of the parties' filings yielded anywhere 50 to 62.8% of his pre-disability salary. (AR 1051.) LINA does not appear to dispute this evidence. Accordingly, Dr. Filarsky has proven by a preponderance of the evidence he was disabled under the terms of the policy. LINA was therefore incorrect in terminating his benefits.
LINA contests Dr. Filarsky's calculation of the amount of benefits he is owed, and Dr. Filarsky dedicates only a paragraph to *946 the subject in his briefing. The Court therefore directs the parties to meet and confer regarding the amount of benefit payments LINA owes Dr. Filarsky under the Policy. If the parties are unable to agree on the appropriate amount to be paid, the parties are to so notify the Court in a joint statement no later than March 1, 2019. The Court will then order supplemental briefing as to the amount of benefits Dr. Filarsky is owed.
F. Equitable Relief Dr. Filarsky Seeks Is Redundant.
In addition to his claim for benefits, Dr. Filarsky seeks equitable relief under 29 U.S.C. § 1132(a)(3). (Dkt. No. 1 ¶¶ 20-25.) "[S]ection 29 U.S.C. § 1132(a)(3) is a 'catchall' provision which provides relief only for injuries that are not otherwise adequately provided for." Biggar , 274 F. Supp. 3d at 971 (quotations omitted). Where Congress provided adequate relief for a beneficiary's injury, there is usually no need for further equitable relief. Id. (quotations omitted).
Here, Dr. Filarsky's § 1132(a)(3) claim duplicates his claim for benefits under § 1132(a)(1)(B). All of the allegations in the operative complaint supporting Dr. Filarsky's claim for equitable relief are grounded in LINA's denial of his disability payments. See id. To the extent Dr. Filarsky positions his claim for equitable relief as a breach of fiduciary duty, his claim for equitable relief is also not permissible. E.g., Wise v. Verizon Commc'ns, Inc. , 600 F.3d 1180, 1190 (9th Cir. 2010) ("Because removal of the ERISA fiduciary is an available remedy under §§ 1109(a) and 1132(a)(2), Wise may not resort to this equitable catchall provision to seek the same relief.") Even so, Dr. Filarsky's breach of fiduciary duty theory is grounded in LINA's refusal to pay benefits. (See Dkt. No. 1, ¶ 24.) Dr. Filarsky's claim for equitable relief is therefore denied.[28]
CONCLUSION
For the foregoing reasons the Court finds that LINA wrongfully determined that Dr. Filarsky was not disabled under the Policy. The Court further holds that Dr. Filarsky is owed damages but no equitable relief. The Court therefore GRANTS IN PART AND DENIES IN PART Dr. Filarsky's motion for judgment and DENIES LINA's motion for judgment. The parties are directed to meet and confer and jointly submit by March 1, 2019 either (i) a statement describing an agreed-upon amount of disability payments Dr. Filarsky is owed or (ii) a statement indicating the parties were unable to agree on the amount of payments Dr. Filarsky is owed. If necessary, the Court will issue an order directing the parties to submit supplemental briefing.
IT IS SO ORDERED.

The parties' failure to consistently cite to the record-particularly where, as here, the administrative record is voluminous-created a significant amount of extra work for the Court. Further, the parties' briefs were each replete with undefined medical jargon, shorthand, and notations, making the briefing rather difficult to review and, again, creating extra work for the Court.

Examples of these accommodations include a sit-to-stand workstation in the exam room, a hands-free phone, an ergonomic office chair, and an elevated microscope. (Id. 1178-79.)

Dr. Stradiotto is the orthopedic surgeon who performed Dr. Filarsky's hip replacement surgery and who has treated Dr. Filarsky for musculoskeletal issues since September 20, 2011. (Id. 1212.)

The policy number is LK-030054. (Id. 1323-58.)

January 4, 2015 is three days prior to Dr. Filarsky's surgery. It is not clear to the Court why LINA used this date to calculate Dr. Filarsky's pre-benefit waiting period (and the parties do not explain this issue in their briefs), but the parties do not contest either that this date was appropriate or that LINA used this date to begin its calculation of the six-month waiting period.

The AR does not appear to contain information as to what Dr. Filarsky's base compensation was as of early January 2015-which, according to the Policy, is the appropriate measure of his base compensation "just prior" to the date of the beginning of his disability. (Id. 1337.) It is possible, of course, that Dr. Filarsky's base compensation amount as of June 2015 was the same as in January of 2015. Nevertheless, LINA does not contest this amount or why it was chosen. The Court therefore can only conclude that LINA does not object to this figure.

The trendelenburg gait is caused by weakness of the hip abductors. A person exhibiting a trendelenburg gait walks in a way that causes the affected hip to swing to the side because the affected hip has difficulty supporting the body's weight. Stedman's Medical Dictionary 359260, 359160 (28th ed. 2006).

Sciatica is leg pain-possibly tingling, numbness, or weakness-originating in the lower back and traveling through the buttock and down the large sciatic nerve in the back of each leg. Stedman's Medical Dictionary 801240 (28th ed. 2006).

Neurapraxia is a disorder of the peripheral nervous system in which there is a temporary loss of motor and sensory function due to nerve blockage. Stedman's Medical Dictionary 599570 (28th ed. 2006).

The pages of the Disability Questionnaire are, inexplicably, out of order in the AR. It is unclear to the Court whether all pages of the Questionnaire have been included. (See id. 856-859.)

Dr. Filarsky states elsewhere in the record that his home is one story. (Id. 1184.) The surveillance report, discussed below, inaccurately describes his home as two-story. (Id. 712, 713.)

An antalgic gait is a gait a patient develops to avoid pain while walking. The patient shortens the "stance" phase of the gait on the affected side. Stedman's Medical Dictionary 359070 (28th ed. 2006).

Dr. Stradiotto's note indicated "RTC" in six months. LINA asserts this means "return to clinic," but there is no evidence in the record to support this, and no explanation in the briefing.

A Work Status Report dated February 5, 2015, prescribed modified activities for a ten-year period beginning April 6, 2015 and ending February 5, 2025, but indicated that Dr. Filarsky should work no more than eight hours each workday. (Id. 1230.) Subsequent Work Status Reports reduced the recommended daily work time. (Id. )

This second definition is: "Total Disability in the Own Occupation Period: A disability that renders one unable to perform with reasonable continuity the substantial and material acts necessary to pursue his usual occupation in the usual or customary way." (Id. 172.) A letter dated August 25, 2015 from LINA to Dr. Filarsky also cites this alternate definition of disability. (Id. 194.)

Dr. Filarsky's counsel erroneously identifies twenty-four exhibits. (Dkt. No. 31 at 8.)

Dr. Bush also spoke to Dr. Stradiotto on May 3, 2016. (Id. 1146.) Dr. Bush and Dr. Stradiotto have different recollections of the nature and content of their conversation. According to Dr. Bush, Dr. Stradiotto stated that the surveillance video demonstrated Dr. Filarsky had a normal gait, that Dr. Filarsky's issues were related to his spine and not his hip replacement surgery, and that Dr. Filarsky was resisting increasing his work hours. (Id. ) Dr. Stradiotto, on the other hand, recalls that he told Dr. Bush that Dr. Filarsky had a slightly impaired gait due to his relative hip abductor weakness. (Id. 1062.)

Dr. Bubanja holds a doctorate in physical therapy and is not a medical doctor. (Id. 1029.)

To the extent that any conclusions of law are inadvertently labeled findings of fact (or vice versa), the findings and conclusions should be considered "in [their] true light, regardless of the label that the ... court may have placed on [them]." Tri-Tron Int'l v. Velto , 525 F.2d 432, 435-36 (9th Cir. 1975).

Dr. Charney was a fill-in physician whose examination of Dr. Filarsky appears to have been a singular occurrence. Dr. Vivek Pai, referenced in Dr. Filarsky's brief, appears to have submitted only one Work Status Report on Dr. Filarsky's behalf. (AR 1228-29.) This is no additional information in the record about Dr. Pai's relationship with Dr. Filarsky. As Drs. Charney and Pai appear to have examined Dr. Filarsky once each, their observations and opinions carry less weight than those of Dr. Stradiotto.

The Court notes that Dr. Askin did not critique the methodology of the FCE in question.

For instance, noting that Dr. Filarsky was prescribed an antibiotic that he was not, misstating dates, mischaracterizing the contents and nature of paperwork and emails, and confusing treatment goals with statements about Dr. Filarsky's actual condition.

In the absence of evidence exhibiting marked improvement, the Court is further puzzled by Dr. Korpman's conclusion in late 2015 that Dr. Filarsky no longer qualified for disability benefits. Cf. Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program , 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010) ("Although Defendant did not need to prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack of consistent, marked progress is probative of her continuing disability.")

Due in part to the clandestine nature of the surveillance, Dr. Filarsky was not in the investigators' sight continuously (and certainly not for four-hour blocks of time) during those days. The surveillance report notes that investigators did not observe Dr. Filarsky leave his home on the third day of surveillance. (Id. 725-26.)

Dr. Filarsky was forthcoming with LINA employees and examining physicians that he (i) owned a small airplane and (ii) flew the small airplane from time to time. (See, e.g. , id. 1312.)

The video in the record is forty-seven minutes long, but Dr. Rashkoff and other sources describe the surveillance video as being thirty minutes long. (AR 180, 662, 667, 708.) The Court can find no explanation for this discrepancy in the AR.

Dr. Stradiotto issued two work status reports that applied to the time following December 31, 2015, the date Dr. Filarsky's benefits were terminated. One Work Status Report, dated December 18, 2015 stated that Dr. Filarsky was capable of working only four hours per day effective January 4, 2016 through December 30, 2016. (AR 1235.) An updated Work Status Report, issued April 14, 2016, stated that Dr. Filarsky was capable of working four hours four days a week and five hours one day a week, beginning May 2, 2016. (Id. 1150.)

The Court declines to consider Dr. Filarsky's "surcharge" argument, as it was raised for the first time in his reply brief. See FT Travel-New York, LLC v. Your Travel Center, Inc. , 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015) (collecting cases).